UNITED STATES of America, Appellant,

v.

George E. GARCIA, Defendant–Appellee.

No. 594, Docket 94–1277.

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1994.

Decided May 26, 1995.

Stephen V. Manning, Asst. U.S. Atty. for the Dist. of Conn., New Haven, CT (Christopher F. Droney, U.S. Atty., of counsel), for appellant.

Suzanne L. McAlpine, New Haven, CT (Hugh F. Keefe, Lynch, Traub, Keefe & Errante, of counsel), for defendant-appellee.

Before: MAHONEY, McLAUGHLIN and HEANEY,* Circuit Judges.

* The Hon. Gerald W. Heaney of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

MAHONEY, Circuit Judge:

The United States brings this interlocutory appeal from a ruling entered April 28, 1994 in the United States District Court for the District of Connecticut, Alan H. Nevas, *Judge,* that affirmed on reconsideration a prior ruling entered March 22, 1994 in that court granting the motion of defendant-appellee George E. Garcia to suppress evidence found in plain view in his residence on the basis that he had not consented voluntarily to the presence in his residence of the law enforcement officers who discovered the evidence. Garcia is charged with unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and knowingly making a false statement in connection with the purchase of a firearm in violation of 18 U.S.C. §§ 922(a)(6) and 924(a)(2). The evidence at issue consists of two firearms that were seized at Garcia's apartment.

We vacate the suppression ruling of the district court and remand.

## Background

On November 11, 1991, special agent Salvatore Petrella of the Bureau of Alcohol, Tobacco and Firearms ("BATF") learned from Danbury police officer Anthony Maher that Garcia, a convicted felon, had purchased a firearm in Danbury. Two days later, after confirming that Garcia both had been convicted of a felony in the State of Connecticut (for assault of a drug dealer who, according to Garcia, had turned Garcia's brother into a heroin addict), and had purchased a firearm, a Winchester rifle, Petrella, along with Maher and Danbury police officer Michael Maroto, went to Garcia's residence to attempt to recover the firearm and to interview him. No search warrant was obtained. Petrella testified that in this case, he preferred to seek voluntary compliance rather than proceed with a search warrant in the first instance.

According to the testimony of Petrella and Maher, they knocked on the front door of the two-family house at which Garcia resided and, when Mrs. Garcia answered, identified themselves and asked to speak with Garcia. After a brief delay, Mrs. Garcia invited the officers into the downstairs area below a staircase leading to the second floor. Garcia was waiting at the top of the stairs near an open door that led to the Garcias' apartment. As Petrella and Maher walked up the stairs, Petrella identified himself and asked to speak to Garcia concerning his acquisition of the rifle. Garcia invited them into his apartment. Maroto waited at the doorway to the Garcias' apartment.

Petrella and Maher further testified that Garcia then brought them to the kitchen table, where they discussed his purchase of the firearm. Although Garcia initially indicated that he had not read the BATF form that all purchasers of firearms must fill out, he then stated that he had read it, but believed that he was prohibited from purchasing only a handgun, but not a rifle. Petrella then asked if Garcia had the weapon on the premises, and Garcia answered that he did and left the table. Petrella followed Garcia to his bedroom, where Garcia produced the weapon. They returned to the kitchen, where Petrella checked the serial number and ensured that the firearm was not loaded, and told Garcia that he would not be able to use it, even for hunting, because of his felony conviction.

Petrella then asked Garcia if he had any other firearms, having noticed a Marlin hunting rifle in a rack in a room between the front door and the kitchen when the officers first entered the apartment. Garcia answered in the affirmative, and either Garcia or Maher retrieved the hunting rifle and brought it back to the kitchen. Petrella wrote a receipt for both weapons and informed Garcia that they were being sequestered because of Garcia's status as a convicted felon. Petrella and Maher characterized Garcia as cooperative throughout the entire encounter.

Garcia and his wife presented a significantly different version of these events. Mrs. Garcia testified that she and her husband heard "loud banging" at their apartment door on the second floor. When Garcia

opened the door, Mrs. Garcia saw the three officers standing in the doorway. She related that Maher then came in, followed by the others, so that they were all in the kitchen, without any invitation from Garcia. Maher asked Garcia where the purchased rifle was, and Garcia indicated that it was in the living room. Maroto then took possession of the rifle and returned with it to the kitchen table. At that point, Petrella sat down with Garcia to discuss the purchase of the rifle.

Mrs. Garcia further stated that the other rifle was on the kitchen floor in plain view, and a discussion about that subject ensued. At that point, Garcia went to his bedroom to put on a robe, and Petrella and one of the officers followed Garcia there. The officers then checked the serial numbers of the firearms and prepared a receipt for them. Garcia's testimony echoed that of Mrs. Garcia. On cross-examination, the government attempted to impeach their general credibility.

Garcia was not arrested at this time. Shortly after this encounter, however, Garcia was arrested for vandalizing the car of the salesperson who had sold him the Winchester and informed the police about the sale. Petrella subsequently prepared a report regarding the seizure of the weapons, which he sent to the office of the United States Attorney about a month later. Garcia was not indicted on the charges alleged in this case until April 28, 1993, more than seventeen months after the encounter at his home.

Once indicted, Garcia moved to suppress the firearms. In its initial ruling, the district court found that Mrs. Garcia let the officers in the downstairs door, that they proceeded upstairs to the Garcia's residence, and that "[b]ecause Garcia opened the upstairs door to his apartment as they approached, the agents did not knock or request permission to enter when they entered the apartment." *United States v. Garcia*, Crim. No. 3:93CR00090 (AHN), slip op. at 2 (D.Conn. Mar. 22, 1994) ("*Garcia I*").

The district court then noted that "[t]he record established that Garcia led an agent to one of the guns in the bedroom, and the other gun was prominently displayed in the living room, such that the guns were in plain view." *Id.* at 4. In view of Garcia's con-

ceded status as a felon, the incriminating nature of the firearms was immediately apparent. *See id.* Accordingly, the seizure of the guns was justified, provided that the officers were lawfully on the premises. *Id.; see also Horton v. California,* 496 U.S. 128, 136–37, 110 S.Ct. 2301, 2307–08, 110 L.Ed.2d 112 (1990); *United States v. George,* 975 F.2d 72, 78 (2d Cir.1992); *Ruggiero v. Krzeminski,* 928 F.2d 558, 561 (2d Cir.1991).

Turning to that question, the court ruled that the government failed to meet its burden of proving that Garcia voluntarily consented to the officers' entry into his apartment. *Garcia I,* slip op. at 5. The court stated:

> [T]he officers did not announce their purpose until they were inside Garcia's apartment; nor was Garcia given Miranda rights or clearly told that he had committed a crime at the time of their visit. Indeed, there was evidence that Garcia did not believe that he had committed a crime.... Under these circumstances, the court cannot find that Garcia understood the possible consequences of the agents' entry into his home and their seizure of his weapons, or that he had a right to refuse to consent to the officers' entry, questioning and requests.

> In light of this, the court finds that the government has failed to meet its burden of proving that Garcia's consent was given knowingly and voluntarily.

*Id.* at 5–6.

The court subsequently reiterated that "the government has not shown that Garcia was sufficiently aware of his rights or circumstances such that the court could find that Garcia complied with Agent Petrella's request freely and intelligently." *Id.* at 6. Accordingly, the court granted Garcia's motion to suppress the seized weapons because "their seizure was not supported by a warrant, nor justified by any exception to the warrant requirement." *Id.* at 3. Addressing the absence of a warrant, the court added that: "While the warrant requirement will yield to certain exigencies, it should not bend to the whims or preferences of law enforcement officers. Here, the choice not to obtain

a warrant was both deliberate and unjustified." *Id.* at 7.

The government moved for reconsideration, arguing that the district court erred in requiring that Garcia's consent be knowing and intelligent, rather than simply voluntary. The government contended that the former requirement, while a proper part of Fifth and Sixth Amendment analysis, is inappropriate to Fourth Amendment analysis.

The district court granted the motion for reconsideration, but adhered to its initial ruling. *See United States v. Garcia,* Crim. No. 3:93CR00090 (AHN), slip op. (D.Conn. Apr. 27, 1994) ("*Garcia II* "). The court stated that Garcia's lack of knowledge that he could refuse consent to the officers' entry was not the sole basis of the initial ruling. *Id.* at 3. Rather, the court stated that it had considered "all of the facts, including Garcia's knowledge of his right to refuse, the context and timing of the officers' entry and search, as well as the inherently coercive effect of the presence of the three law enforcement officers." *Id.* at 3–4. The court relied upon a Ninth Circuit decision, *United States v. Shaibu,* 920 F.2d 1423 (9th Cir.1990), in support of its ruling. *Garcia II,* slip op. at 4.

The court further noted that even if it concluded that the officers were affirmatively invited into the house, "this would not change the court's conclusion. Indeed, the government's focus on the invitation obscures the issue. An invitation does not necessarily give the officers carte blanche to search the house, nor would it have been reasonable for the officers to believe that Garcia invited them into his house to search for his guns." *Id.* at 5. This appeal followed.

## Discussion

The government's principal arguments are that: (1) *Florida v. Jimeno,* 500 U.S. 248, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991), and *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990), require an objective test for ascertaining whether the officers reasonably believed that Garcia had consented voluntarily to their entry, a test that was satisfied on this record; and (2) in any event, the court improperly required the government to prove that Garcia knew of his

right to refuse consent. In addition, the government faults the district court's reliance on *Shaibu,* as well as certain of its factual findings.

It is by now well established that while a warrantless search of a home is generally unreasonable and therefore violates the Fourth Amendment, which proscribes "unreasonable searches," an individual may consent to a search, thereby rendering it reasonable. *See United States v. Kon Yu-Leung,* 910 F.2d 33, 40–41 (2d Cir.1990) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 226–27, 93 S.Ct. 2041, 2043–44, 2047–48, 36 L.Ed.2d 854 (1973)); *see also United States v. Wilson,* 11 F.3d 346, 351 (2d Cir. 1993), *cert. denied,* — U.S. —, —, —, 114 S.Ct. 1415, 1563, 2142, 128 L.Ed.2d 86, 209, 870 (1994). To ascertain whether consent is valid, courts examine the " 'totality of all the circumstances' " to determine whether the consent was "a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority." *Wilson,* 11 F.3d at 351 (quoting *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2048; other citations omitted); *see also Yu-Leung,* 910 F.2d at 41.

It is also well established that the concept of knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial, does not govern in the Fourth Amendment context. *See Schneckloth,* 412 U.S. at 241–42, 93 S.Ct. at 2055–56 (explicating "vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment"); *see also Rodriguez,* 497 U.S. at 183, 110 S.Ct. at 2798–99. This is so because the Fourth Amendment prohibits not all searches and seizures, but only those that are "unreasonable". *See Rodriguez,* 497 U.S. at 183, 110 S.Ct. at 2798. So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search. *Schneckloth,* 412 U.S. at 228, 93 S.Ct. at 2048. Therefore, knowledge of the right to refuse consent is not a requirement to a finding of voluntariness, *id.* at 231–33, 93 S.Ct. at 2049–50, although it may be a factor in ascertaining whether the

consent was coerced. *Id.* at 248–49, 93 S.Ct. at 2058–59; *see also Yu–Leung,* 910 F.2d at 41.

Recent Supreme Court decisions emphasize both that only unreasonable searches are proscribed by the Fourth Amendment, and that the issue of reasonableness is to be measured by an objective standard. In *Rodriguez,* which addressed a consent to a search by someone who, it turned out, lacked the authority to provide consent, the Court stated that:

> It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or *the police officer conducting a search or seizure under one of the exceptions to the warrant requirement*—is not that they always be correct, but that they always be reasonable.

*Id.* 497 U.S. at 185–86, 110 S.Ct. at 2800 (emphasis added).

In *Jimeno,* which involved ascertaining the scope of a consent to a search, the Court reiterated that "[t]he touchstone of the Fourth Amendment is reasonableness[,]" 500 U.S. at 250, 111 S.Ct. at 1803, and then held that: "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 251, 111 S.Ct. at 1803; *see also United States v. Snow,* 44 F.3d 133, 134–35 (2d Cir.1995) (same (quoting *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04)); *United States v. Davis,* 967 F.2d 84, 87 (2d Cir.) (same (quoting *Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04)), *cert. denied,* —— U.S. ——, 113 S.Ct. 356, 121 L.Ed.2d 270 (1992). Thus, "[t]he Fourth Amendment is satisfied when, under the circumstances, it is objectively reasonable for the officer to believe that the scope of the suspect's consent permitted him to [conduct the search that was undertaken]." *Jimeno,* 500 U.S. at 249, 111 S.Ct. at 1803.

■ Of course, this objective standard does not preclude an assessment of the particularities of the situation that is presented in any given case. On the contrary, it is still the totality of the circumstances that must be considered. *See, e.g., United States v. Sanchez,* 32 F.3d 1330, 1335–36 (8th Cir.1994) (applying *Jimeno/Rodriguez* test in context of consenting party who did not speak English and provided consent via interpreter/accomplice), *cert. denied,* —— U.S. ——, 115 S.Ct. 1119, 130 L.Ed.2d 1082 (1995). Nonetheless, the ultimate question presented is whether "the officer had a reasonable basis for believing that there had been consent to the search." *Sanchez,* 32 F.3d at 1334–35 (collecting cases).

■ We believe that the district court should reconsider its suppression rulings in this case in the light of these standards and precedents. We disagree with the district court's assertion that "the government's focus on the invitation [to enter Garcia's apartment] obscures the issue." *Garcia II,* slip op. at 5. On the contrary, an objective view of whether the officers had a reasonable basis to perceive such an invitation (or, more precisely, the consent thereby implied) *is* the issue. Further, it is irrelevant whether an invitation to enter also comprehended an invitation "to search the house" or "to search for his guns," *id.,* because no such search occurred. Nor does the presence of three law enforcement officers lend significant support to a claim of coercion. Consent to a search has been found despite formal arrest, *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *United States v. Moreno,* 897 F.2d 26, 33 (2d Cir.), *cert. denied,* 497 U.S. 1009, 110 S.Ct. 3250, 111 L.Ed.2d 760 (1990), and such additional aggravating circumstances as handcuffing of a suspect, the presence of six law enforcement officers in his home, and their assurance that they would remain indefinitely and secure a search warrant if consent were withheld. *Yu–Leung,* 910 F.2d at 41 (collecting cases).

■ We accept the district court's assertion in *Garcia II* that the court did not "rely solely [in *Garcia I* ] on whether Garcia knew

of his right to refuse the officers' entry or consent to their search." *Garcia II,* slip op. at 3. Nonetheless, the court ruled in *Garcia I* that Garcia's consent to the officers' entry was not "knowing *and* voluntary" precisely because the court could not "find that Garcia understood the possible consequences of the agents' entry into his home and their seizure of his weapons, or that he had a right to refuse to consent to the officers' entry, questioning and requests." *Garcia I,* slip op. at 5–6 (emphasis added). Such lack of awareness is germane only if it resulted in a consent to entry that was "the product of duress or coercion," *Schneckloth,* 412 U.S. at 227, 93 S.Ct. at 2047; *see also Yu–Leung,* 910 F.2d at 41, *and* the officers as a result did not have a "reasonable basis for believing that there had been consent to the search." *Sanchez,* 32 F.3d at 1334; *see also Jimeno,* 500 U.S. at 251, 111 S.Ct. at 1803–04; *Snow,* 44 F.3d at 134–35; *Davis,* 967 F.2d at 87.

■ We note that reliance upon *Shaibu* is misplaced. *Shaibu* states that consent to enter a home will not be inferred in the absence of "a specific request by police for permission to enter a home." 920 F.2d at 1428. Our precedent is to the contrary. *See United States v. Deutsch,* 987 F.2d 878, 883 (2d Cir.1993) ("consent … 'can be found from an individual's words, acts or conduct' ") (quoting *Krause v. Penny,* 837 F.2d 595, 597 (2d Cir.1988) (citing *United States v. Buettner–Janusch,* 646 F.2d 759, 764 (2d Cir.), *cert. denied,* 454 U.S. 830, 102 S.Ct. 126, 70 L.Ed.2d 107 (1981))). *Garcia II* quotes *Shaibu* for the proposition that courts must " ' "indulge every reasonable presumption against waiver" of fundamental constitutional rights.' " *Garcia II,* slip op. at 4 (quoting *Shaibu,* 920 F.2d at 1426 (quoting *United States v. Page,* 302 F.2d 81, 84 (9th Cir. 1962))) (further quotations omitted). This is flatly inconsistent with *Schneckloth,* 412 U.S. at 243, 93 S.Ct. at 2056 ("unlike those constitutional guarantees that protect a defendant at trial, it cannot be said every reasonable presumption ought to be indulged against voluntary relinquishment"). *Shaibu* is also invoked for the proposition that consent to a search must be " ' "intelligently" ' " given. *Garcia II,* slip op. at 3 (quoting *Shaibu,* 920 F.2d at 1426 (quoting *Page,* 302 F.2d at 83)).

As previously summarized, *Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59, and *Yu–Leung,* 910 F.2d at 41, reject this view.

We note also the district court's previously quoted admonitions regarding the officers' failure to secure a warrant, *see Garcia I,* slip op. at 7, and its observation that it would have been better practice to obtain a warrant or have Garcia sign a written consent form. *See Garcia II,* slip op. at 8 n. 3. "[A] search pursuant to consent may result in considerably less inconvenience for the subject of the search, and, properly conducted, is a constitutionally permissible and wholly legitimate aspect of effective police activity." *Schneckloth,* 412 U.S. at 228, 93 S.Ct. at 2048. In any event, we perceive no significant connection between the failure of the officers to obtain a search warrant in this case and the issue whether they reasonably believed that Garcia had consented to their entering his apartment.

The government seeks outright reversal of the district court's suppression ruling, rather than a vacatur and remand. It is true that, as the government contends, the district court resolved virtually all disputed issues of fact in favor of the version proffered by the government's witnesses. In addition, the district court explicitly found that "Garcia opened the upstairs door to his apartment as [the officers] approached" the door, *Garcia I,* slip op. at 2, rejecting the Garcias' contrary testimony. Nonetheless, in view of the essentially factual nature of the inquiry, *see Schneckloth,* 412 U.S. at 248–49, 93 S.Ct. at 2058–59, we believe that the consent issue should be addressed by the district court in the first instance in the light of the legal norms adduced in this opinion.

## Conclusion

The ruling of the district court affirming, on reconsideration, the court's original ruling to suppress the firearms seized from Garcia's apartment is vacated. The case is remanded for further proceedings not inconsistent with this opinion.