**UNITED STATES of America**

v.

**Marvin BRISBANE, Defendant.**

**No. 95 Cr. 0871 (DAB).**

United States District Court,
S.D. New York.

June 26, 1996.

Mary Jo White, United States Attorney, Southern District of New York (William E. Craco, Assistant United States Attorney, of counsel), New York City, for U.S.

Leonard F. Joy, The Legal Aid Society, Federal Defender Division (Inga L. Parsons, of counsel), New York City, for Defendant.

BATTS, District Judge.

Defendant Marvin Brisbane moves to suppress physical evidence and statements pursuant to Rule 12 of the Federal Rules of Criminal Procedure. The Court held an evidentiary hearing on April 15, 1996. The Government and the Defendant each filed post-hearing briefs on May 17, 1996.

## BACKGROUND

On the afternoon of September 5, 1995, Amtrak police investigators John Cody and Christopher Faletta were assigned to the drug enforcement unit in Penn Station when they observed Defendant, Marvin Brisbane, standing in the ticket line. (Tr. at 4–5.) Brisbane, a young black male carrying a knapsack and a white paper food bag, looked over the crowd as he waited in line before purchasing a ticket with cash at the ticket window. (Tr. at 5–6.)

After purchasing his ticket, Brisbane entered the waiting area and took a seat on a three-seat bench. (Tr. at 7–8.) He sat in an end seat and placed his knapsack and his food bag on the middle seat. (Tr. at 8.) Investigator Cody then entered the waiting area and sat down in the third seat, while Investigator Faletta took a position about fifteen feet away. (Tr. at 8.) Investigator Cody identified himself as a police officer and asked Brisbane if he could talk to him. (Tr. at 8.)

Brisbane responded affirmatively, and a conversation ensued in which Brisbane explained that he was travelling to New London, Connecticut, his place of residence, following a Labor Day weekend visit to see his family in Coney Island, Brooklyn. Brisbane also explained, in response to Cody's questioning, that he worked in fast food in a casino in Connecticut. (Tr. at 9–10.)

As Investigator Cody and Brisbane talked, Brisbane was eating chicken and throwing the bones into the open white paper bag, which still rested on the seat between the two men. (Tr. at 10.) Brisbane then asked what the problem was, in response to which Cody explained that he was a narcotics investigator and that "we had a big problem with people transporting drugs on Amtrak trains." (Tr. at 10.) According to Cody, Brisbane became a little more nervous, and "began moving in his seat a little bit." (Tr. at 10.)

Investigator Cody then sought consent to search Brisbane's knapsack and consent was granted. (Brisbane Aff. ¶ 2; Tr. at 11.) On direct examination, Investigator Cody testified that Brisbane "granted me consent by saying something to the effect of [']yeah, sure, go ahead.[']" (Tr. at 11.) On cross-examination, counsel brought out that in response to the request to search the knapsack, Brisbane picked up the knapsack, handed it to Investigator Cody, and said something to the effect of, "Go ahead, look all you want." (Tr. at 17.) According to Investigator Cody, this left no doubt that Brisbane was granting consent to search the knapsack. (Tr. at 17.)

After failing to find any contraband in the knapsack, Investigator Cody questioned

Brisbane about the contents of the knapsack, and the fact that it did not contain any items such as toiletries, or a change of socks or underwear. (Tr. at 11–12.) According to Cody, Brisbane explained that he had borrowed such items from family members. (Tr. at 12.)

At this point, Officer Cody testified that he sat up in his seat, looked into the white paper bag, pointed, and then asked Brisbane if he could "look in the paper bag." (Tr. at 12.) On direct, Cody testified that Brisbane "responded again something to the effect of [']yeah, sure, go ahead.[']" (Tr. at 12.) On cross-examination, Cody testified that Brisbane did not say, "sure, you can look all you want" in response to this request. (Tr. at 19.) Cody further testified that Brisbane did not hand Cody the paper bag. (Tr. at 19.) Brisbane testified by affidavit that he never gave consent to Investigator Cody to search the white paper bag. (Brisbane Aff. ¶ 3.)

Investigator Cody testified that after asking for consent to search the white paper bag, he put his hand into the bag and pulled out a package wrapped in a paper towel with rubber bands around it. (Tr. at 12.) When Investigator Cody removed the package from the bag, he held it out to Brisbane and asked, "Marvin, what's this?" (Tr. at 13.) Brisbane responded, by standing up, taking the package from Investigator Cody, and saying, "That's my biscuit." (Tr. at 14.) Investigator Cody then requested that Brisbane hand him the package, to which Brisbane responded, "If you want my biscuit, you're going to have to lock me up for it." (Tr. at 14.)

Investigator Cody proceeded to take Brisbane into custody, and take him to a processing center in Penn Station. (Tr. at 15; Brisbane Aff. ¶ 4.) Brisbane was placed in a holding cell, at which time the package was opened, and found to contain a white powdery substance, which Investigator Cody

believed to be cocaine. (Tr. at 14–15.) Investigator Cody next searched Brisbane, recovering three small bags of marijuana from Brisbane's shoe.[1] (Tr. at 15.) Investigator Cody testified that following the search and recovery of the marijuana, Cody read Defendant Brisbane his Miranda rights, and then asked Brisbane what he had. (Tr. at 15.) According to Cody, Brisbane responded that he had "coke."[2] (Tr. at 15.) Contrary to Cody's testimony that the admission regarding "coke" came after the appropriate warnings, Brisbane stated that the Miranda warning was read only after he had responded to some of Investigator Cody's questions. (Brisbane Aff. ¶ 4.)

On cross-examination, Investigator Cody admitted that, during the time he has served as a narcotics enforcement officer for Amtrak, he has never obtained a search warrant, though he is familiar with the mechanics for obtaining one. (Tr. at 20–21.) Cody testified that if someone refuses to consent to a search, he walks away. (Tr. at 21–22.)

Defendant Brisbane did not testify at the suppression hearing.

### DISCUSSION

Where the validity of a search rests on consent, the Government "has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given." *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). Based on the evidence presented, the Court finds that the Government has not met its burden, and specifically finds that it has failed to prove that Defendant Brisbane gave consent to Investigator Cody to search Brisbane's white paper bag.[3]

The direct and unmistakable manner in which Brisbane granted consent to search his knapsack—by actually handing the knapsack to the officer and saying something to the

---

1. On cross-examination, Investigator Cody testified that Brisbane may have informed the officer prior to the search that he had marijuana in his shoes. (Tr. at 33.)

2. Subsequent laboratory testing confirmed that the white powdery substance was in fact cocaine, and that the three small packages indeed contained marijuana. (Tr. at 15–16.)

3. Because the Government argues only the presence of actual consent, the distinction between actual consent to search and an officer's reasonable belief that there had been consent to search, *see U.S. v. Garcia,* 56 F.3d 418, 423 (1995), is irrelevant.

effect, "go ahead, look all you want"—is in stark contrast to the manner in which Investigator Cody testified consent was given to search the white paper bag. Despite this contrast, Investigator Cody in his direct testimony was content to describe both in virtually identical language, testifying in the first instance that "[h]e granted me consent by saying something to the effect of ['] yeah, sure, go ahead[']" for the knapsack, (Tr. at 11), and similarly that "[h]e responded again something to the effect of ['] yeah, sure, go ahead[']" as to the white paper bag, (Tr. at 12). Yet immediately upon Investigator Cody removing the "biscuit" from Brisbane's white paper bag, Brisbane stood up and took the "biscuit" back. (Tr. at 12 & 20.) In light of Brisbane's response to Investigator Cody's search, the Court finds incredible the officer's testimony that Brisbane consented to the search of the white paper bag.

This conclusion is further supported by the fact that Investigator Cody never actually touched the white paper bag, despite his claims to have been given consent to search it. (Tr. at 19.) If such consent had been given, Investigator Cody could have picked up the bag and taken it into his control before searching its contents, as he had done with the knapsack.

On this basis, and having heard the testimony and evaluated the credibility of the Government's witness, the Court finds that the Government has failed to prove that the search of the white paper bag was conducted with the consent of the Defendant.

■ The Government has not argued that, prior to taking the "biscuit" from the bag, Investigator Cody had probable cause to arrest and search Brisbane. Accordingly, having determined that Brisbane did not consent to the search of the white paper bag that resulted in discovery of the "biscuit" of cocaine, it is clear that the search was unreasonable, and thus violated Brisbane's rights under the Fourth Amendment. *See Royer*, 460 U.S. at 500–01, 507–08, 103 S.Ct. at 1325–36, 1329–30; *United States v. Kon Yu-Leung*, 910 F.2d 33, 40–41 (2d Cir.1990); *see also Smith v. Ohio*, 494 U.S. 541, 542–43, 110 S.Ct. 1288, 1289–90, 108 L.Ed.2d 464 (1990).

■ Where a search violates the constitutional rights of an accused, all evidence deriving from that violation must be suppressed as the "fruit of a poisonous tree," unless the taint of the constitutional violation has dissipated. *See Wong Sun v. United States*, 371 U.S. 471, 485–88, 83 S.Ct. 407, 416–18, 9 L.Ed.2d 441 (1963). In this case, the exclusionary rule bars introduction of all the evidence in the case, including the 50 grams of cocaine, the marijuana, and all of Brisbane's post-arrest statements. *See id.* at 485, 83 S.Ct. at 416 ("The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion. . . . [V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion.").

## CONCLUSION

Defendant's motion to suppress is granted in its entirety.

SO ORDERED.