# UNITED STATES OF AMERICA

v.

## Justice TAYLOR, Defendant.

### No. 03 CR.029 JSR.

United States District Court, S.D. New York.

Aug. 20, 2003.

Jessica Roth, Criminal Division, United States Attorney, Southern District New York, New York City, for U.S.

### *MEMORANDUM ORDER*

RAKOFF, District Judge.

Defendant Justice Taylor moves to suppress a shotgun recovered by New York City police officers during their warrantless search of his home.[1] The Government concedes the officers lacked probable cause to search but alleges that Taylor consented to the search, which Taylor denies.

Determining the accuracy or inaccuracy of this claim of consent has proven difficult, for even though the Court, in addition to reviewing numerous written submissions and oral arguments, conducted two separate evidentiary hearings, most of the witnesses who testified proved unreliable. For example, one of the three police officers who testified had sworn to a materially false complaint regarding his knowledge of this case, and a second had recorded materially false entries in his notebook regarding his whereabouts on the day in question. Conversely, several of the five defense witnesses who testified materially contradicted each other. Indeed, in the end, after a very careful review of the testimony and the Court's still-vivid recollection of the varying demeanors of the witnesses as they testified to various events, the Court reluctantly concludes that none of the witnesses was entirely accurate in what he or she recounted and that several were sufficiently lacking in credibility as to make it impossible for the Court to rely on their testimony except in the most cautious and circumspect fashion (as, *e.g.*, when an otherwise unreliable witness admitted something favorable to his adversary and unfavorable to his own position).

Nonetheless, after sifting through this morass of dubious testimony and after assessing demeanor, drawing inferences (sometimes negative), and weighing probabilities, the Court concludes that what actually occurred is, more likely than not, the following:

---

1. The case was subsequently referred to the U.S. Attorney's Office, which is prosecuting Taylor as a felon in possession of the firearm here in issue. *See* 18 U.S.C. § 922(g)(1); Indictment, 03 Cr. 329. A broader motion to suppress originally made while the case was assigned to the late Hon. Allen G. Schwartz was narrowed to the instant motion when, following Judge Schwartz's untimely demise, the case was re-assigned to the undersigned.

Around 11 p.m. on December 4, 2002, in a housing project in the Bronx, several New York City police officers were searching for the assailants in a fatal shooting that had occurred earlier that evening. Transcript, July 1, 2003 ("Tr.I"), at 5–6. Sergeant Brian Branigan, the Anti–Crime Supervisor in the 43d Precinct, arrived on the scene with a team of plainclothes officers. Tr. I at 6–13, 109–10, 166. Upon learning that the shooters were seen fleeing in the general direction of Seward Avenue, Sgt. Branigan, acting on a hunch that a reputed gang member named Douglas Thomas might be involved, went with other officers to what Sgt. Branigan understood was Thomas's last known address, apartment 3D at 1682 Seward Avenue. *Id.*

In fact, however, Thomas was not there; instead, it appears, he was incarcerated. Tr. I at 12, 27–28; Transcript, July 29, 2003 ("Tr.II"), at 33, 208–09. The apartment was leased to Mrs. Gladys Taylor, age 72, and her son Justice Taylor, age 47. Tr. II at 30, 47, 208. At the time Sgt. Branigan arrived, Mr. Taylor was conversing in the living room with three friends, Harold Utsey, Dana Samuels, and Louise James, while his mother dozed in a back bedroom, her adopted 15–year–old son Angel washed dishes in the kitchen, and Justice Taylor's niece and her newborn child slept in a second bedroom. Tr. I at 184, 197–98, 209, 212–13; Tr. II at 32, 37.

Sgt. Branigan knocked loudly on the door while four plainclothes officers and at least two uniformed officers stood to his side. Tr. I at 13; Tr. II at 35. After ascertaining it was the police, Justice Taylor opened the door. Tr. II at 32–33. As he did so, at least some of the officers had their hands on their weapons, and several may have had them drawn. Tr. II at 33, 35, 36, 40–41; Tr. I at 206.

Sgt. Branigan announced that there had just been a shooting in the neighborhood and asked whether the police could look around the apartment "to make sure everything is all right." Tr. I at 91; *see also* Tr. II at 34. Taylor responded: "Let me go make sure it's all right with my mother." Tr. I at 92, *as corrected in* Tr. II at 65–66; *see also* Transcript, July 17, 2003, at 5–6; Tr. II at 34, 46–47. Taylor then turned away from the door and began walking toward his mother's bedroom. Tr. I at 92–94. Although the door remained somewhat open, Taylor did not open it wider or indicate with his body language that the officers should enter. Tr. II at 46, *see also* Tr. I at 17.[2]

Nevertheless, after Taylor turned away and started down the hallway toward his mother's room, Sgt. Branigan and Officers Edward Herrera and John Ferrara followed after him without his permission and even without his being aware, initially, that he was being followed, Tr. II at 42; Tr. I at 92–95. As he followed Taylor, Officer Ferrara looked into the first bedroom on his left, the door to which was open, and allegedly saw the barrel of a shotgun stick-

---

**2.** Here, as elsewhere, the Court has not cited to contrary testimony that the Court discredited or discounted. For example, although parts of the police witnesses' testimony could be construed to suggest that Taylor held the door open as he walked away from it, implicitly inviting entry, *see* Tr. I at 15–16 (Branigan), 94 (Ferrara), other testimony from the same or other police witnesses was to the contrary, either directly, *see* Tr. I at 17 (Branigan) ("He turned around, and if I didn't catch the door, I just held the door, and he turned around, and he walked down the hallway towards his mother's room."), or implicitly, *see* Tr. I at 137 (Herrera) ("The door did not close."). The Court, however, discredits not only much of the former testimony but also the police officers' testimony regarding Taylor's alleged hand-and-arm gestures, which the Court, observing the demeanor of the police witnesses as they testified on this subject, found doubtful in the extreme.

ing up between a night table and the bed. Tr. I at 94–96, 98–99.[3] This was the gun that was seized.

Meanwhile, the remaining officers entered the apartment and commenced an intrusive and somewhat belligerent search of the other occupants and the premises. Tr. I at 184–88, 198–99; Tr. II at 33, 36–37. Although nothing suspicious was observed except the shotgun in one bedroom, Sgt. Branigan, without further inquiry, then ordered the arrest of all the occupants of the entire apartment except the three who were in bed, charging them with criminal possession of a weapon. Tr. I at 24–25; Gov't Ex. 3504–B. For example, Louise James, age 38, a homemaker without any prior criminal record, who lived upstairs and was simply socializing with Taylor in the living room, was arrested and detained for three days before being released. Tr. I at 195, 199–203. Ultimately, charges were dropped against all the arrestees except Taylor.

 The police officers' uninvited entry into Taylor's apartment was not "a *de minimis* intrusion that may be disregarded," *Maryland v. Buie*, 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), but rather was a " 'physical entry of the home[,] . . . the chief evil against which the wording of the Fourth Amendment is directed,' " *Payton v. New York*, 445 U.S. 573, 585, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). Such warrantless intrusions are *per se* unreasonable unless they fit one of "a few specifically established and well-delineated exceptions," such as valid consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Although officers may infer consent "from an individual's words, gestures, or conduct," *United States v. Buettner–Janusch*, 646 F.2d 759, 764 (2d Cir. 1981), such inferences must be objectively warranted and reasonable, *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995). Moreover, while the validity of a search does not depend on the recitation of a "talismanic phrase," *Buettner–Janusch*, 646 F.2d at 764, mere silence or the failure to object does not constitute consent unless the totality of circumstances so indicates, *see, e.g., United States v. Jaras*, 86 F.3d 383, 390 (5th Cir.1996); *State v. Avila*, 566 N.W.2d 410, 413–14 (N.D.1997) (collecting cases). Thus, the Government bears the burden of showing by a preponderance of the evidence that, under the totality of circumstances, there was an objectively reasonable basis for officers to believe they had Taylor's consent to enter his apartment and to follow him down the hallway toward his mother's bedroom. *Garcia*, 56 F.3d at 423; *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir.1993).

 The facts, as found by the Court, fail to satisfy this burden. When Sgt. Branigan, surrounded by an entourage of armed police, asked Taylor if he could search the apartment, Taylor did not say yes, nod, or otherwise assent affirmatively to Sgt. Branigan's request. Instead he indicated he first had to "make sure it's all right with" his mother. Tr. I at 92, Tr. II at 36. It matters not whether this was out of genuine concern for her, Tr. II at 37, and in recognition that she had lived

---

**3.** There was contrary evidence that the gun was hidden and could not have been seen from where Officer Ferrara claims he was standing. *See* Tr. II at 42–43. Because the Court finds that the initial entry was without consent or otherwise warranted, the Court need not resolve this further dispute. For the same reason, the Court need not consider whether any alleged "consent" on Taylor's part was simply acquiescence to a show of authority.

there 30 years (making the apartment, in some sense, "hers"), Tr. I at·208–10, or whether it was simply a stall or an evasion on Taylor's part; for whatever Taylor's motives, he did not objectively manifest consent that the police do anything but remain outside the doorway. Indeed, although at one point in the hearings this Court speculated that other possible readings of Taylor's words might exist in the abstract, *see* Tr. II at 67, the Court, having now reviewed the facts more carefully in light of its credibility findings and all the facts and circumstances, concludes not only that Taylor, by his words and body language, was unequivocally declining permission to enter or search, but also that Sgt. Branigan fully understood this at the time—which is why Sgt. Branigan, when he testified, felt the need to embellish his account with details indicating consent that the Court finds unbelievable. More generally, Sgt. Branigan, whose cockiness was evident even on the stand, exhibited a disregard for niceties that makes his leadership of a non-consensual intrusion wholly plausible.

This is not a case where an individual "opened the door wider and stood back," *United States v. Sanchez*, 635 F.2d 47, 55 (2d Cir.1980), "invited" the police "to talk in the living room," *Deutsch*, 987 F.2d at 881, or otherwise ratified non-consensual entry by warning a following officer to avoid a hazard, *Gerald M. v. Conneely*, 858 F.2d 378, 384 (7th Cir.1988). Taylor explicitly indicated that communication with his mother was a precondition to the police officers' entry. His failure to object to their entrance would be meaningful only if the officers had reason to think Taylor knew they were behind him, which they did not. The clear import of Taylor's answer—that the officers' entry could only be approved by his mother—combined with the absence of any other act by Taylor that could reasonably be construed as consent under the circumstances, compels

the conclusion that no reasonable officer would have crossed the threshold of that apartment, much less followed Taylor through his home.

The truth is that Sgt. Branigan and his squad, intent on finding some clue to a recent, and still mysterious, homicide, were determined to follow their hunch that they would find something relevant in an apartment they associated with another person altogether, Douglas Thomas. Given that hunch, they were reluctant to let Taylor out of their sight. Indeed, even the officers' own accounts of why and how they followed Taylor suggest that at the time they relied, not on Taylor's consent (as they now profess), but on a wholly unwarranted belief they were entitled to perform a protective sweep. When asked his purpose in following Taylor, Sgt. Branigan testified as follows:

> The purpose was twofold. We practice that we don't, you know, let people—there's a possibility there could be someone in here that's dangerous or not dangerous. We don't let them walk around, unless we know where they're going. I watch for my safety and the safety of other cops.
>
> He told Grandma, his mother—excuse me—that he was going to tell her the police were there and, you know, I figured I'd just talk to his mother. I'm wearing the shield. I'm the police. I would explain real quick, you know, that there was a shooting, and that's it.

Tr. I at 21; *accord* Tr. I at 96 (Ferrara) ("My purpose was basically to make sure that Mr. Taylor didn't do anything and that there was nobody in the apartment that we didn't see for our safety."); Tr. I at 138 (Herrera). Sgt. Branigan further testified that Officers Ferrara and Herrera were "trained" not to leave him alone, Tr. I at 20, that their responsibility was "to secure an open door .... to make sure that nobody comes out of a closet, no one

comes out from under a bed," Tr. I at 81. All of this was irrelevant, however, because absent even permission to enter, the police were not entitled to perform a protective sweep of this apartment for their own safety—nor does the Government contend otherwise.[4]

Accordingly, because the police had neither consent nor any other legitimate basis for entering the apartment, defendant's motion to suppress the shotgun seized incident to that unlawful entry is hereby granted. Counsel for the parties should jointly telephone Chambers by no later than August 29, 2003, to schedule further proceedings herein.

SO ORDERED.

---

4. It may be noted, moreover, that even if there had been consent to enter the apartment and stand in the foyer—and there was not—such consent would not justify following Taylor as part of a protective sweep. In *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), the Supreme Court defined a protective sweep as a quick search "incident to an arrest," and it held that such a search would be justified only if, "based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing that the area swept harbored an individual posing a danger to the officer or others." *Id.* at 327, 110 S.Ct. 1093 (citation omitted from second quotation, alterations in original). No such facts existed in this case, where the police saw four individuals socializing peacefully in an apartment.