**UNITED STATES OF AMERICA**

v.

**Juan CAMILO and Bolivar Camilo, Defendants.**

**No. 02 CR 1575(JGK).**

United States District Court,
S.D. New York.

Oct. 15, 2003.

Christopher P. Conniff, U.S. Attorneys Office, New York City, for Plaintiff.

Barry A. Weinstein, Goldstein & Fuld, Bronx, NY, Steven Statsinger, Edward Kratt, New York City, for Defendants.

### OPINION and ORDER

KOELTL, District Judge.

The defendants, Juan and Bolivar Camilo, were indicted on charges of distribution

and possession with intent to distribute more than 200 grams of mixtures and substances containing a detectable amount of cocaine base (Count One) and more than 1,000 grams of mixtures and substances containing a detectable amount of methamphetamine (Count Two), both in violation of 21 U.S.C. § 841(b)(1)(A) and 18 U.S.C. § 2, as well as at least 300 grams of mixtures and substances containing a detectable amount of cocaine (Count Three), in violation of 21 U.S.C. § 841(b)(1)(C) and 18 U.S.C. § 2. The defendants now move to suppress the physical evidence seized from the apartment in which they were arrested on November 27, 2002. The defendants argue that both the law enforcement officers' entry into the apartment and the subsequent search of the apartment following their arrest violated the Fourth Amendment. The Government argues that the officers were legitimately present in the apartment to execute an arrest warrant for Juan Camilo, and that, in any event, Ashley DeJesus, Juan Camilo's wife, consented to their entry into the apartment. The Government also contends that the officers obtained Ms. DeJesus's consent to search the apartment after the defendants were placed in custody. An evidentiary hearing was held on August 12, 2003, and the Court heard testimony from two of the officers who entered the apartment, Deputy United States Marshals Timothy O'Callaghan and Michelle Rios. Having considered the witnesses' testimony and assessed their credibility, and having considered the submissions of the parties, the Court makes the following findings of fact and conclusions of law.

## I.

On the morning of November 27, 2002, at about 6:00 or 6:30 a.m., a team of law enforcement officers-which included members of the United States Marshals Service's Warrant Squad and detectives with the New York City Police Department ("Marshals")—proceeded to Apartment 5P at One Bogardus Place in Manhattan to execute an arrest warrant for Juan Camilo. (Transcript of hearing dated August 12, 2003 ("Tr.") at 4, 37, 60.) The New York State Supreme Court had issued a bench warrant dated May 17, 1999 for Juan Camilo's arrest. (Bench Warrant attached as Ex. B to Gov't Letter to the Court dated Apr. 14, 2003.) Deputy O'Callaghan testified that the Marshals understood that Juan Camilo was located at the apartment that morning, but there was no testimony, or any other evidence in the record, regarding who provided that information to the Marshals or when. (Tr. 4.) Five of the Marshals went to the door of the apartment, while one covered the fire escape. (*Id.* 4.) At least one of the members of the team, Deputy Rios, spoke Spanish. (*Id.* 5, 50–51.)

The Marshals knocked on the door, and it was answered by Ashley DeJesus, whom the Marshals had previously understood to be Juan Camilo's wife. (*Id.* 4, 39.) Deputy O'Callaghan asked Ms. DeJesus who else was in the apartment, and she replied that her "husband" was there. (*Id.* 4, 39, 51.) Deputy O'Callaghan had his badge around his neck, but he did not tell Ms. DeJesus that the Marshals had an arrest warrant for her husband. (*Id.* 12, 16, 18.) Deputy O'Callaghan asked Ms. DeJesus whether the Marshals could "come in and look around," and she said, "yes." (*Id.* 4, 5, 51.) The Marshals did not have their guns drawn at this point and made no threats toward Ms. DeJesus. (*Id.* 5, 10–11.) Deputy O'Callaghan spoke to Ms. DeJesus at the door, and he spoke in English. (*Id.* 11.) Neither Deputy O'Callaghan nor Deputy Rios can remember whether these questions were also translated into Spanish, but it is Deputy Rios's normal practice to begin translating when

a person being questioned looks confused or appears not to understand English. (*Id.* 11, 52.) After agreeing to allow the Marshals to enter, Ms. DeJesus stepped back and held the door open as the Marshals entered the apartment. (*Id.* 18, 52, 62.)

The door opened into the apartment's living room, and there were no lights on in that room as the Marshals entered. (*Id.* 5.) The Marshals used their flashlights to see where they were going as they began their protective sweep of the apartment. (*Id.* 5, 47.) Ms. DeJesus stood off to the side of the living room with small children. (*Id.* 6–7, 17, 61.) Deputy Rios testified that she probably had her gun drawn at this point, because it is the usual procedure of the United States Marshals Service for marshals to have their guns drawn while doing a protective sweep. (*Id.* 52–53.)

Deputy Rios secured the closet, the bathroom, and a side bedroom. (*Id.* 52.) Deputy O'Callaghan, accompanied by two NYPD detectives, proceeded into a bedroom at the rear of the apartment, where he saw two men sleeping in twin beds. (*Id.* 7, 19, 47–48.) He recognized one of the men as Juan Camilo, because he had seen NYPD photographs of Juan Camilo beforehand. (*Id.* 7, 41–42.) Deputy O'Callaghan got Juan Camilo out of bed and handcuffed him. (*Id.* 7.) Bolivar Camilo was the other individual sleeping in the room, and he was also ordered out of bed and handcuffed. (*Id.* 7.)

As the defendants were being restrained, the lights were turned on in the bedroom, although it is not clear by whom. (*Id.* 7–8, 20–21, 44–45.) After the lights were turned on, Deputy O'Callaghan could see a large, soft-shelled rectangular suitcase at the foot of one of the two beds. (*Id.* 8, 23.) The top to the suitcase was propped open at about a forty-five degree

angle by clothes piled in the suitcase. (*Id.* 24–25.) Deputy O'Callaghan could see "a large bundle of pills in like Saran Wrap" just inside the open suitcase. (*Id.* 8.) He could see the bundle of pills, which was larger than a softball, without having to touch it and without having to move any of the clothes in the suitcase. (*Id.* 25–26.)

After they were handcuffed, Juan and Bolivar Camilo were taken from the bedroom and seated in two chairs in the living room. (*Id.* 9.) As they were being moved to the chairs, lights were turned on in the living room, and the Marshals could see on a table in the room "a scale, some small little baggies that are common with drug trafficking, maybe some rubber bands." (*Id.* 9, 53–54.) Deputy O'Callaghan asked the defendants if there were any more drugs or guns in the apartment, but neither of them responded. (*Id.* 9, 26–28, 68–69.) Deputy O'Callaghan, with Deputy Rios translating into Spanish, asked Ms. DeJesus if there were any guns or drugs in the apartment, and she replied, "no." (*Id.* 9–10, 27–28, 54.) Deputy Rios recalls translating at this point because it was "basically established that [Ms. DeJesus] felt more comfortable in Spanish." (*Id.* 54.) Deputy O'Callaghan asked if the apartment belonged to Ms. DeJesus and whether the Marshals could "look around," and she replied, "yes." (*Id.* 9–10, 29–30, 54.) The Marshals did not threaten Ms. DeJesus, and Deputy O'Callaghan had replaced his gun in his holster. (*Id.* 11, 16, 59.)

The Marshals then began to conduct a search of the apartment for guns and drugs. (*Id.* 10.) Deputy O'Callaghan went back into the rear bedroom to search the suitcase to see if there were any more drugs in addition to the pills he had seen previously. (*Id.* 22.) Deputy Rios returned to the closet, the bathroom, and the side bedroom that she had secured as part

of the initial protective sweep. (*Id.* 54.) As part of the search of the bathroom, Deputy Rios touched the medicine cabinet, and it "started wobbling" and she realized that it was set loosely in the wall. (*Id.* 55.) Without any difficulty, Deputy Rios was able to slide the medicine cabinet out of the wall and place it on the floor. (*Id.* 69–70.) In the wall behind the medicine cabinet, she discovered drugs, some in brick form and some in powdered form. (*Id.* 55.)

Because of the large quantity of drugs discovered in the bathroom, the Marshals called the Drug Enforcement Agency ("DEA"). (*Id.* 58.) The DEA sent a team of agents, and when they arrived they immediately presented Ms. DeJesus with a consent form in Spanish, which she signed. (*Id.* 58.) The Marshals then sought to document the fact that they had earlier obtained verbal consent from Ms. DeJesus for the search. (*Id.* 56.) Deputy Rios, using the DEA consent form as a model, wrote out on a blank sheet of paper a consent form in Spanish that Ms. DeJesus also signed. (*Id.* 56–58, 71; Gov't Hearing Ex. 2.) Translated from the Spanish, the consent form stated that Ms. DeJesus "gave permission to the officials to look in this apartment for drugs and weapons." (*Id.* 88.)

## II.

The defendants have moved to suppress all of the evidence discovered in the apartment. They contend that the Marshals' entry into the apartment was unconstitutional in violation of the Fourth Amendment, and that any subsequent search and seizure conducted in the apartment was also in violation of the Fourth Amendment because it was conducted without a warrant and without a valid exception to the warrant requirement.

 The initial issue, therefore, is whether the entry into the apartment by the Marshals violated the Fourth Amendment. The Marshals did not have a search warrant for the apartment, but they did have an arrest warrant for Juan Camilo.[1] It is well established that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *see also United States v. Lauter*, 57 F.3d 212, 214 (2d Cir.1995). "Agents may enter a suspect's residence, or what they have reason to believe is his residence, in order to effectuate an arrest warrant where a reasonable belief exists that the suspect is present." *Lauter*, 57 F.3d at 214. The Court of Appeals for the Second Circuit has concluded that the "reasonable belief" standard is less stringent than the "probable cause" standard. *See id.* at 215. To satisfy the requirements of the Fourth Amendment, the officers' belief must be reasonable, not necessarily correct, because "the constitutional requirement is that [the officers] have a basis for a reasonable belief as to the operative facts, not that they acquire all available information or that those facts exist." *United States v. Lovelock*, 170 F.3d 339, 344 (2d Cir.1999). "Courts have recognized that once police officers have reason to believe that a suspect lives in a particular dwelling, they may reasonably infer that he will be home early in the morning." *United States v. Lovelock*, No.

---

1. There is no question that there was an outstanding bench warrant for the arrest of Juan Camilo. While there is no evidence whether the Marshals actually had the arrest warrant with them, this issue was not developed at the hearing and is not dispositive. *See* Fed. R. Cr. P. 4(c)(3).

96 Cr. 440, 1997 WL 4574 (S.D.N.Y. Jan. 7, 1997) (citing *United States v. Terry*, 702 F.2d 299, 319 (2d Cir.1983)), *aff'd*, 170 F.3d 339 (2d Cir.1999).

Although the Marshals had a valid arrest warrant for Juan Camilo, it cannot be determined on this record that the Marshals' entry into the apartment was justified under *Payton*, because there is no evidence that the Marshals had a reasonable belief that Juan Camilo resided in the apartment. Deputy O'Callaghan testified that the Marshals "understood" that Juan Camilo would be "located" in the apartment on the morning of November 27, 2002. However, there is no basis for concluding that this understanding constituted the reasonable belief required under *Payton*. There was no testimony or other evidence regarding the reliability of the source of the information or any efforts by the Marshals independently to confirm the information. The fact that Ms. DeJesus indicated that her "husband" was home when asked by the Marshals was not sufficient in itself to create a reasonable belief on the part of the Marshals that Juan Camilo resided at the apartment. There is no evidence that the Marshals knew who Ms. DeJesus was when she answered the door. Moreover, there is no testimony or evidence regarding the reliability of the information the Marshals had received that Ms. DeJesus and Juan Camilo were married. Therefore, there is no basis to conclude that Ms. DeJesus's reference to her "husband" could have created a reasonable belief that Juan Camilo resided in the apartment and that he was present that morning. Therefore, based on the record as it exists, the Marshals' entry into the apartment cannot be justified under *Payton*.

Even though the Marshals lacked a search warrant for the apartment and even though the arrest warrant did not authorize their entry, the Marshals' entry into the apartment was nonetheless justified, because Ms. DeJesus consented to their entry. The Fourth Amendment prohibits unreasonable searches and seizures, and a search conducted without a valid warrant is "per se unreasonable ... subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (internal quotation marks and citation omitted). One of those exceptions arises when a search is freely and voluntarily consented to by either a lawful occupant of the premises or someone with similar common authority over the place to be searched. *Id.; United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir.1995); *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir.1980). The Government bears the burden of proving that the consent to search was indeed voluntary. *Schneckloth*, 412 U.S. at 222, 93 S.Ct. 2041. To prove voluntariness, the Government is not required to show knowledge of the right to refuse consent, although that knowledge may be a factor in determining whether consent was coerced. *Id.* at 231–33, 249, 93 S.Ct. 2041; *Garcia*, 56 F.3d at 422–23. Voluntariness must be the product of an "individual's free and unconstrained choice" and may not be established simply by a person's "mere acquiescence in a show of authority." *See United States v. Wilson*, 11 F.3d 346, 351 (2d Cir.1993). Nonetheless, a valid consent need not be expressed through any particular phrase, and it "can be found from an individual's words, acts or conduct." *Krause v. Penny*, 837 F.2d 595, 597 (2d Cir.1988). "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circum-

stances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041.

■ "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991); *see also Garcia,* 56 F.3d at 423. Therefore, the Fourth Amendment is satisfied if law enforcement officers have a reasonable basis for believing that they received consent to conduct the particular search that was undertaken. *See Jimeno,* 500 U.S. at 249, 111 S.Ct. 1801; *Garcia,* 56 F.3d at 423.

Under this standard for assessing consent to search, it is plain that Ms. DeJesus voluntarily consented to the Marshals' entry into the apartment to look around and that the initial search was within the scope of that consent. When asked whether the Marshals could come in to look around, she said that they could. There is no basis for concluding that there was a language barrier between Ms. DeJesus and the Marshals such that the Marshals reasonably should have questioned the voluntariness of her consent. She understood the Marshals well enough to answer that her husband was home when they asked her who else was in the apartment. Moreover, Deputy Rios credibly testified that it would have been her practice to translate questions into Spanish if Ms. DeJesus had appeared confused or not able to understand English. Although the Marshals later determined that Ms. DeJesus was more comfortable communicating in Spanish, when they arrived they reasonably believed, based on their exchanges with her at the door, that Ms. DeJesus understood English well enough to provide consent to enter the apartment.

In addition to her verbal consent, Ms. DeJesus's conduct confirmed the fact that she agreed to let the Marshals into the apartment. After agreeing to the Marshals request, Ms. DeJesus stepped back from the door and held it open as the Marshals entered the apartment. There is no credible evidence that Ms. DeJesus was merely acquiescing in a show of authority, and there is no indication that she was coerced, either expressly or implicitly, by the Marshals. For all of these reasons, the Marshals could reasonably have believed that Ms. DeJesus had consented to their entry. *See Sanchez,* 635 F.2d at 60 (upholding district court's finding of consensual search where defendant told thirteen-year-old son to open door, and son then "opened the door wider and stood back" when police requested permission to enter apartment).

■ Because the Marshals were legitimately present in the apartment, the next issue is whether the evidence discovered inside the apartment, including the pills in the suitcase and the drugs in the bathroom wall, were lawfully seized. The consent to enter the apartment to look around was reasonably viewed as consent to look for Ms. DeJesus's husband, and therefore the Marshals had consent to enter the bedroom to search for and seize Juan Camilo. Moreover, once inside the apartment, the Marshals were authorized to conduct a protective security sweep of the apartment to locate anyone who might reasonably pose a danger to their safety. *See Maryland v. Buie,* 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); *United States v. Kiyuyung,* 171 F.3d 78, 83 (2d Cir.1999). In the process of locating and detaining Juan Camilo and Bolivar Camilo, Deputy O'Callaghan saw the pills in the suitcase in the bedroom. The pills fall under the plain view exception to the warrant requirement. Under the plain

view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). The Court of Appeals has stated that "[p]atently incriminating evidence that is in plain view during a proper security check may be seized without a warrant." *Kiyuyung*, 171 F.3d at 83.

At the time that Deputy O'Callaghan saw the pills, the Marshals were legitimately in the apartment, and they were legitimately present in the rear bedroom for the purpose of locating Juan Camilo and conducting the protective sweep. Deputy O'Callaghan credibly testified that he could see the pills without having to open the suitcase any more than it was already open and without having to touch the pills or anything else in the suitcase. The room was initially illuminated by the Marshals' flashlights, and then at about the time that the defendants were placed in handcuffs the bedroom lights were turned on, so there is no doubt that Deputy O'Callaghan would have been able to see an object just inside the partially open suitcase. Based on Deputy O'Callaghan's credible testimony, it is also clear that it was immediately apparent to Deputy O'Callaghan that the pills-wrapped in cellophane in a bundle larger than a softball-were incriminating.

The evidence that was lying on the table in the living room, including the scale and the packaging material, was also lawfully seized. When the Marshals brought the defendants out of the bedroom and seated them in the living room, the lights in that room were turned on. At that point, the evidence on the table was in plain view, and the testimony makes clear that the incriminating nature of the evidence was immediately apparent to the Marshals.

The pills and the evidence on the table would also have been lawfully seized as part of the search to which Ms. DeJesus consented following the arrest of the defendants. The Marshals asked Ms. DeJesus if there were any more drugs or guns in the apartment, and she replied that there were none. The Marshals then asked if she would object to their "looking around". The testimony makes clear that she could not reasonably have understood this question to mean anything other than a request to search the apartment for guns or drugs, especially given the fact that the Marshals requested permission to "look around" immediately after Ms. DeJesus denied the presence of any guns or drugs in the apartment. The questions posed to Ms. DeJesus were also translated into Spanish by Deputy Rios. While an early morning arrest in a home would be alarming and difficult for anyone, it is plain that the Marshals did not threaten Ms. DeJesus or otherwise coerce her into providing consent. At the time she provided her consent to the search, she was not placed in custody and was not under any form of restraint. Given that Ms. DeJesus was communicating in Spanish, that she was a resident of the apartment, that she denied the presence of any drugs or guns in the apartment, and that she assented to a request to search for those objects, a reasonable person could have concluded-as the Marshals did-that Ms. DeJesus had freely and voluntarily provided her consent to search the apartment. *See United States v. Garcia*, No. 01 Cr. 35, 2001 WL 1297791, at *7–*8 (S.D.N.Y. Oct. 25, 2001) (concluding that bilingual woman had opened apartment door, agreed to admit

officers, and thereafter verbally consented to search of apartment), *aff'd*, 339 F.3d 116 (2d Cir.2003). The written consent form that she signed for the Marshals confirmed the valid verbal consent to search that she had previously provided.[2]

The Marshals could also have reasonably concluded that Ms. DeJesus's consent to search the apartment extended to any part of the apartment where guns and drugs might be found. *See Jimeno*, 500 U.S. at 251, 111 S.Ct. 1801 ("The scope of a search is generally defined by its expressed object."). Therefore, it was reasonable for the Marshals to look behind a medicine cabinet only loosely set in a bathroom wall to see whether drugs or guns had been hidden behind it. Therefore, the drugs that were found in the bathroom were lawfully seized pursuant to the consent given by Ms. DeJesus.

### CONCLUSION

For the reasons explained above, the defendants' motion to suppress the evidence obtained from the apartment in which they were arrested is denied.

SO ORDERED.

---

**2.** While Ms. DeJesus also signed a written consent from for the DEA, there is no contention that any of the evidence seized in the apartment was discovered by the DEA or seized pursuant to the DEA consent form.