UNITED STATES of America

v.

Rafael A. SANTOS, Defendant.

No. 03 CR. 238(SAS).

United States District Court,
S.D. New York.

Aug. 29, 2003.

David E. Patton, The Legal Aid Society, Federal Defender Services Unit, New York, New York, for Defendant.

Michael Y. Scudder, Jr., Assistant United States Attorney, United States Attorney's Office, Southern District of New York, New York, New York, for the Government.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

When the police came to the home of defendant Rafael Santos they had neither a search warrant nor an arrest warrant, and they clearly lacked probable cause to arrest Santos. But the anonymous caller who led the officers to the apartment reported a disturbance in Apartment 2C of 1223 Wheeler Avenue (Santos's apartment), and the complainant at the scene told the officers there was a gun in the drawer of the night-stand in Santos's apartment. Rather than secure the premises and apply to the court for a search warrant, the police conducted a warrantless search of the apartment, without consent, until they found what they came for—the gun. They then arrested Santos in his home for robbery and possession of a weapon.

The police now claim that the seizure of the gun was justified by the usual litany of exceptions to the Fourth Amendment's warrant requirement: consent, exigent circumstances, and protective sweep, as well as the plain view doctrine as an extension of these exceptions. But none of these justifications has any merit. This case presents a classic end run around the Fourth Amendment's warrant requirement. Determined to find the evidence they believed was in the apartment, the police simply ignored the rules.

The Supreme Court has emphatically stated that "since the origins of the Republic," our society has had an "overriding respect for the sanctity of the home." *Payton v. New York*, 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). The Court succinctly summarized the Fourth Amendment's warrant requirement in these words:

> At the core of the Fourth Amendment, whether in the context of a search or an arrest, is the fundamental concept that any governmental intrusion into an individual's home ... must be strictly circumscribed ... The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed [and courts] have long adhered to the view that the warrant procedure minimizes the danger of needless intrusion of that sort. It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable ... Crime, even in the privacy of one's own quarters, is, of course, of grave concern to society, and the law allows such crime to be reached on proper showing. The right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

*Id.* at 582–86, 100 S.Ct. 1371 (quotations and citations omitted).

Because the governmental intrusion in this case was not warranted by the facts or the law, the evidence must be suppressed. Had the police taken the time to obtain a warrant, if indeed one could have been obtained given the very thin facts that the officers had, this prosecution could proceed. But in balancing society's need to safeguard the Fourth Amendment's protections guaranteed to all who reside in the United States, the evidence illegally seized from the home of Rafael Santos—and his post-arrest statements—must be suppressed.

## I. BACKGROUND

Defendant Rafael Santos is charged in a one count indictment with possession of a firearm by a convicted felon in violation of Title 18 U.S.C. § 922(g)(1). Santos now moves to suppress two guns that were found in his apartment, and statements that were made following the discovery of the guns, as fruits of an illegal search. An evidentiary hearing was held on June 30 and July 1, 2003. Post-hearing briefs were submitted on July 8 and July 14, 2003. For the reasons set forth below, the motion is granted.

Santos is a 38–year–old man from the Dominican Republic who moved to the United States as a teenager. Though married, he is separated from his wife and lives alone in the Bronx. *See* 6/30/03–7/1/03 Transcript ("Tr.") at 145. In November 2002, Santos was the manager of Gun Hill Mobil, a combined gas station, mechanic's garage, car wash and mini

mart, and typically worked 12–hour shifts. *See id.* at 146.

Sometime before the morning of the disputed events, a friend of Santos introduced Santos to Marsha Dawson, a prostitute who lived near Santos. *See id.* at 148. On at least two separate occasions prior to November 20–21, 2002, Santos paid Dawson to have sex with him in his apartment. After they had sex in the second occasion, Santos took a large amount of money out of his pocket and paid her $100. Dawson remarked about the fact that Santos had a lot of cash, and he explained that he was the general manager of a gas station. Dawson then asked Santos if he ever feared that someone would break into his apartment and rob him. *See id.* at 152. Santos told Dawson that he was not afraid because he protected himself with a weapon. Santos then opened the drawer to his night-stand and showed Dawson a gun that he kept in the drawer. *See id.* at 153.

## II. UNCONTESTED FACTS

On November 20, 2002, Santos went to work at 10 a.m. and stayed until the last shift closed at 10 p.m. Santos's uncle, a lawyer who was visiting from the Dominican Republic and staying with Santos, was with Santos at the gas station, and the two went back to Santos's apartment together. They arrived home between 10 and 10:30 p.m. *See id.* at 102, 127–129, 147.

Santos's mother also was visiting from out-of-town and staying with Santos, and she was at the apartment cooking dinner when Santos and his uncle arrived. Santos, his uncle and his mother ate dinner together and relaxed in front of the television. Between 12 midnight and 12:30 a.m. on November 21, 2002, all three went to bed. *See id.*

The Government and the defendant do not dispute that in the early morning hours of November 21, 2002, the New York City Police Department ("NYPD") received a 911 call from an anonymous female reporting a disturbance at 1223 Wheeler Avenue in the Bronx. *See id.* at 178. However, they do dispute what happened between the time that Santos and his family went to bed and the time of the 911 call, and what happened after the police responded to the 911 call.

## III. CONTESTED FACTS

### A. The Defendant's Version

According to Santos, sometime after he went to bed, his mother came into his room and woke him up. She told him that someone was knocking on the door. Santos went to the door, looked through the peephole, and saw Dawson on the other side of the door. Without opening the door, Santos asked Dawson what she wanted, and she responded that she wanted to come inside and have sex with him. Santos told Dawson that she could not come inside because he had visitors, and asked her to leave. Dawson told Santos that she needed money, and asked for $50. *See id.* at 148–49. Santos told her to come back the following day. Dawson then claimed that Santos owed her $50 for being "with" Santos's friend. *Id.* at 149. Santos denied owing any money, but told Dawson that if his friend owed her money, Santos would speak with the friend the following day. Dawson told Santos that she needed the money "now," and that if he did not open the door for her, she would "create a scandal." *Id.* at 149–50. Santos told Dawson that if she did not leave, he would call the police. Dawson left, and Santos and his mother went back to bed. *See id.* at 150.

Sometime later, Santos's mother awoke Santos again and told him that Dawson, accompanied by a man, was knocking on the door, turning the doorknob and trying to get inside. Santos again went to the

door and, without opening it, asked Dawson what she wanted. Dawson demanded money, and Santos told her to leave. In an effort to scare her, he also told her that he had called the police. *See id.* at 150–51. Dawson told Santos that if he called the police, he was "the one who [wa]s going to have the problem." *Id.* at 151. Dawson and her male companion then pushed on the door and turned the knob. Santos went into his bedroom, got his .32 caliber gun, and returned to the door. *See id.* at 105, 151. He reminded Dawson that he had a gun, and again told her that he had called the police and they were on their way.[1] *See id.* at 152. Dawson and her companion left. *See id.* at 153.

After they left, Santos remained in the living room with his mother for a few minutes, trying to calm her down. Santos's mother believed that Dawson and her male companion were trying to break into the apartment and rob Santos. She had not understood either exchange between Santos and Dawson because the conversations were in English, and Santos's mother does not speak English. *See id.* at 104–06. Santos told his mother that he would call the police. He began to dial, but before he completed the call, there were more very loud knocks at the door. *See id.* at 106–07, 154.

Believing that Dawson and her companion were trying to break down his door, Santos yelled, "I'm calling the police."

*Id.* at 154; Defendant's Post–Hearing Memorandum in Support of His Motion to Suppress Evidence ("Def.Mem.") at 2. Someone on the other side of the door responded, "[t]his is the police." *Id.* Santos's mother looked through the peephole and confirmed that the police were, in fact, at the door. Before opening the door, Santos walked to the dining area,[2] lifted the rug that was under the table, and put his .32 caliber pistol underneath the rug. *See id.* at 121, 155, 172. He then opened the front door. *See id.* at 118, 121–22, 155, 175.

Upon opening the door, Santos saw three or four officers. *See id.* at 155. One of the officers asked Santos, in English,[3] who he was and who owned the apartment. Santos identified himself and informed the officer that he owned the apartment. The officer then turned to Dawson, who was standing behind the officer, and asked her whether Santos was, "the man." *Id.* She said yes. The police officers entered the apartment with Dawson, instructed Santos to stand against the wall, and frisked him.[4] *See id.* at 156. Santos asked the officers why they brought Dawson into the apartment, and they informed Santos that Dawson said he had a gun in the bedroom.

The officers told Santos that they intended to search the night-stand in the bedroom. *See id.* at 157. Santos told the officers that he did not want anyone to search his apartment. *See id.; see also*

---

1. Santos had not called the police, and did not call the police at any time that morning. He told Dawson and her companion that he had called the police in an effort to scare her away. *See* Tr. at 151, 153.

2. The three bedroom apartment has a large main room that serves as both the living room and the dining room. *See* Tr. at 17, 63, 77, 157–58; Diagram of Apartment, Defendant's Hearing Ex. 1. The front door of the apartment opens into this large living room/dining room. *See* Diagram of Apartment.

3. Both Santos's mother and his uncle testified that Santos's initial conversation with the police officers was in English. *See* Tr. at 108, 130. Because neither Santos's mother nor his uncle speak English, they did not understand the conversation. *See id.*

4. Neither Santos's mother nor his uncle offered testimony on the issue of whether Santos was frisked.

4/21/03 Declaration of Rafael Santos ("Santos Dec."), Ex. A to Defendant's Motion and Memorandum in Support Thereof to Suppress Evidence ("Def.Pre–Hrg.Mem."), ¶ 3. The officers then pointed to Santos's mother and asked whether she was his mother. *See* Tr. at 157. Santos said yes, and further said that he owned the apartment and did not want it searched. He then turned to his mother and told her, in Spanish, not to allow the officers to search the apartment. *See id.* at 109, 131, 140, 157. Santos's mother told the officers, in Spanish, not to search the apartment.[5] *See id.* at 109, 131, 157; *see also* 4/9/03 Declaration of Mercedes Esquilin Tejeda ("Tejeda Dec."), Ex. B to Def. Pre–Hrg. Mem., ¶ 3.

Two of the officers and Dawson went into Santos's bedroom.[6] *See id.* at 110, 119, 132, 142, 157, 159–60. The officers who remained in the living room/dining room with Santos, his mother and his uncle asked Santos if they could "check" the room. *Id.* at 160. Santos said no, and in Spanish directed his mother to say no if the officers asked for her permission to search the room. *See id.* at 160–61; *see also* Santos Dec. ¶ 3; Tejeda Dec. ¶ 3.

From where Santos was standing in the living room, he could see the officers and Dawson in the bedroom. *See* Tr. at 161. He saw the officers go directly to the night-stand, open the drawer, and remove a silver air-pistol.[7] The officers showed the air-pistol to Dawson and asked her whether it was the weapon she had described. She said no. *See id.* at 162. The

officers searched the bedroom, but did not find any additional contraband.

At that point, the officers instructed Dawson to go downstairs and wait outside. *See id.* One of the officers asked Santos where the "other weapon" was. *Id.* Santos denied having another weapon. *See id.* at 163. Over Santos's and his mother's protests, the officers began searching the living room/dining room. *See id.* at 111, 163. Santos told the police officers that they had no right to search his apartment. *See id.* at 163. The sergeant instructed one of the officers to handcuff Santos and take him downstairs to a police car. *See id.*

After Santos was removed from the apartment, Santos's mother asked the officers where they were taking her son, and they told her that they were taking Santos to the 43rd Precinct. *See id.* at 114–15. Several officers searched the living room with a flashlight. *See id.* at 111–12, 133–34, 136. One officer went back into Santos's bedroom and went through the pockets of Santos's pants. *See id.* at 111. The officer who searched the pants came back into the living room with money he had found in the pants pocket. *See id.* at 111, 136. The officers who were in the living room moved pillows and plants, and lifted up the rug under the dining room table. *See id.* at 111, 134. After finding the .32 caliber pistol under the rug, the officers left the apartment with the gun and money. *See id.* at 112, 136.

Santos was taken to the 43rd Precinct, where he agreed to answer questions after being advised of his rights. *See id.* at 164–65.

---

5. Although Santos's uncle also was in the room, the officers did not address him at any point, and he did not speak to them. *See* Tr. at 110.

6. Santos's uncle testified that before the officers went into Santos's bedroom, they handcuffed Santos and said they were going to arrest him. *See* Tr. at 132–33. Both Santos

and his mother testified that he was not handcuffed until after the officers came out of the bedroom with the silver air-pistol. *See* Tr. at 111, 163.

7. An air-pistol is similar to a BB gun, can injure, and can kill if fired at close range. *See* Tr. at 47–48.

## B. The Government's Version

The Government's version of the events is quite different, and the accounts of the Government's witnesses vary significantly.

According to the police officers, one sergeant and five officers of the NYPD responded to the anonymous 911 call. *See id.* at 9, 72. Upon arriving at the scene, the officers encountered a man and a woman standing outside the apartment building. *See* Government's 5/5/03 Opposition to Defendant's Motion to Suppress ("Gov't Mem.") at 2; Tr. at 10, 40, 70. The woman was Dawson.[8] *See* Gov't Mem. at 2; Def. Mem. at 2. She told the police officers that she had been inside apartment 2C that evening performing a "dance" for a "gentleman" in the apartment. Tr. at 40; *see also id.* at 57, 71.[9] After she completed the "dance," the gentleman paid her $300. *Id.* He then took out a gun, held it to her head, and demanded the money back. He took the money from her and put it in his pocket. *See id.*

Dawson provided the officers with a description of Santos, his apartment and Santos's bedroom, and told the officers that they "should find the firearm in the night-stand by his bed." *Id.* at 72; *see also id.* at 12. Dawson described the firearm as a small black gun with a brown handle. See *id.* at 12. After consulting among themselves, the sergeant and four of the officers entered the building.[10] *See id.* at 12–13, 42, 73.

Sergeant Santana and Officer Mercado knocked on the door of apartment 2C. *See id.* at 43. An occupant of the apartment responded without opening the door, stating, "I'm calling the police." *Id.* at 13–14, 43, 73, 83. Through the closed door, the officers identified themselves as police officers. *See id.* Shortly thereafter, the door opened. *See id.* at 14, 44, 73.

According to Officer Mercado, Santos opened the door of the apartment with his mother standing directly behind him. *See id.* at 14. Santos's mother immediately began speaking to the officers in Spanish, and Officer Mercado responded to her in Spanish. Officer Mercado asked Santos's mother, in Spanish, whether the officers could enter the apartment, and she responded in Spanish, saying, "Sure, come in." *Id.* at 15. Officer Brennan, on the other hand, claims that when the door opened, Santos, his mother and his uncle were all standing in the doorway. *See id.* at 44. Officer Mercado and Sergeant Santana spoke to the occupants in Spanish,[11] and then turned to the other officers and told them that they could enter the apartment. *See id.* at 44, 56. Finally, Sergeant Santana testified that Santos opened the apartment door, immediately invited the officers into the apartment in English, and then walked away from the door and towards his mother and uncle, who were inside the apartment. *See id.* at 75, 83, 85.

### 1. Officer Mercado's Version[12]

After the police officers entered the apartment, Officer Mercado briefly

---

8. Dawson was not the woman who made the 911 call. *See* Tr. at 178.

9. Dawson did not testify at the hearing. Her statements were offered through Officers Mercado and Brennan and Sergeant Santana.

10. Santos does not dispute that the NYPD responded to the anonymous 911 call, or that the officers encountered Dawson on the street outside his building. *See* Tr. at 178. He does

dispute the story that Dawson told the officers in its entirety. *See supra* Part III.A.

11. Officer Brennan does not speak Spanish and consequently did not understand the conversation. *See* Tr. at 44, 56.

12. Because each officer's testimony of the subsequent events differs substantially, I recount each in turn.

stepped into the front bedroom to ensure that no one else was in the apartment. *See id.* at 15. He then stepped back into the living room and had a conversation, in Spanish, with Santos's mother. During that conversation, Officer Mercado asked Santos's mother for permission to "take a quick look around for [his] own safety and [his] partners' safety." *Id.* at 16. Santos's mother told Officer Mercado that she did not "want anybody going into the bedroom, into the drawers looking in the closets." *Id.* Officer Mercado informed Santos's mother that he would not go into her bedroom or the kitchen, or look in any drawers, and that he would look only in the living room. *See id.* at 16–17. Santos's mother then consented to Officer Mercado's request. *See id.* at 17.

During the time that Officer Mercado was conversing with Santos's mother, Officers Laschet, Curtin and Brennan were in Santos's bedroom with Santos.[13] *See id.* at 16. Officer Mercado does not know whether the officers were given permission to enter the bedroom. *See id.* at 26, 30.

Pursuant to Santos's mother's consent, Officer Mercado looked behind the couch and moved the pillows of the couch, and looked around the dining room table and a plant next to the table. *See id.* As he was about to tell Santos's mother that he had not found anything, the other officers emerged from the bedroom with Santos and arrested him. *See id.* at 17, 23. Officer Curtin told Officer Mercado that they had found a weapon in the bedroom, that it was not the weapon that Dawson had described, and that there was another gun in the apartment.[14] *See id.* at 23–24.

At that point, Officer Mercado noticed a "hump" under the rug, which was approximately seven feet from where he was standing. *See id.* at 18–19, 31. He walked over to the "hump" and stepped on it to determine whether something was under the rug. *See id.* at 19. Officer Mercado felt something hard, so he got down on his knee and looked under the rug with a flashlight. *See id.* Without pulling the rug back, Officer Mercado saw the handle of a gun. *See id.* at 19–20. Upon seeing the gun, he lifted the rug and pulled the gun out from underneath the rug. *See id.* at 21.

### 2. Officer Brennan's Version [15]

After entering the apartment Officer Brennan checked to ensure that no one else was inside the apartment. *See id.* at 45. While he was looking around, Officer Mercado and Sergeant Santana were speaking with Santos's mother, and Officer Laschet was talking with Santos.[16] *See id.*

---

**13.** Officer Mercado offered no testimony with respect to where Sergeant Santana was located or what he was doing during this time.

**14.** Officer Mercado's testimony is unclear with respect to when Dawson was shown the gun that was recovered in the bedroom and denied it was the weapon she previously had described. On cross-examination, he testified that Dawson looked at the gun "[p]robably as soon as it was found." Tr. at 22. Upon further questioning, he stated that Dawson was not in the apartment, she was "downstairs in front of the stairs, in front of the landing, the doorway." *Id.* Officer Mercado then testified that he learned that the firearm recovered in the bedroom was not the firearm Dawson previously had described after Officer Curtin left the apartment, went downstairs to show the firearm to Dawson, and came back upstairs. *See id.* at 23.

**15.** Officer Laschet was unavailable to testify at the hearing. The Government submits that his testimony would corroborate Officer Brennan's testimony. *See* Tr. at 99–100, 179.

**16.** Officer Brennan never heard Sergeant Santana or Officer Mercado ask Santos, his mother or his uncle for permission to search the apartment, and never heard Santos, his mother or his uncle consent to such a search. *See* Tr. at 56, 59–60. However, according to

Officer Brennan heard Officer Laschet ask Santos for permission to enter Santos's bedroom, and heard Santos consent. *See id.* at 45, 58. Officers Brennan, Laschet and Curtin then entered Santos's bedroom with Santos. *See id.* at 46.

Once inside the bedroom, Officer Brennan noticed that the drawer to the nightstand was open. *See id.* He and Officer Laschet approached the drawer and saw a silver gun inside the drawer.[17] *See id.* Officers Brennan and Laschet retrieved the gun from the drawer. The officers and Santos then returned to the living room with the silver gun.

At that point, one of the officers asked Dawson to come upstairs from the first floor landing where she was waiting, and identify the gun. *See id.* at 48. She came upstairs and told the officers that the silver gun was not the gun that she had described earlier.[18] Officer Laschet arrested Santos,[19] and Officer Brennan went into Santos's bedroom to retrieve Santos's pants for him. Officer Brennan checked the pants pockets, and found approximately $200 in the pocket. *See id.* at 49, 58.

Santos was handcuffed and taken downstairs. *See id.* at 58. Approximately 10 to 15 seconds later, Officer Brennan heard Officer Mercado say that he had found a second gun. *See id.* at 50. Officer Merca-

do told Officer Brennan that he saw the gun "protruding out of the rug underneath the dining room table," which Officer Brennan understood to mean that "half of it was protruding." *Id.* at 60–61.

### 3. Sergeant Santana's Version

Upon entering the apartment, Sergeant Santana and Officer Mercado walked over to Santos's mother, and Santos "walked off," *id.* at 75, towards the bedroom with Officers Laschet, Brennan and Curtin,[20] *see id.* at 75, 86. Sergeant Santana and Officer Mercado had a "casual conversation" with Santos's mother, *id.* at 77, wherein they explained to her that they had received a call from a woman who reported that she had been robbed at gunpoint inside Santos's apartment. *See id.* at 76–77.

While Sergeant Santana and Officer Mercado were talking with Santos's mother, Officer Laschet summoned Sergeant Santana towards the bedroom. Officer Laschet informed Sergeant Santana that a firearm was found in the bedroom, and then placed Santos under arrest. *See id.* at 78–79. Sergeant Santana instructed Officers Laschet, Brennan and Curtin to take Santos downstairs. *See id.* at 79.

---

Officer Brennan, Sergeant Santana and Officer Mercado spoke with Santos's mother in Spanish, and Officer Brennan does not speak or understand Spanish. *See id.* at 56, 59.

**17.** The silver gun was later identified as an air-pistol. *See* Tr. at 47.

**18.** On-cross examination, Officer Brennan initially said that Dawson did not come upstairs, and was "always on the landing." Tr. at 58. He subsequently said that she "was not on the landing. She was on the stairwell." *Id.* at 63.

**19.** On cross-examination, Officer Brennan testified that Santos already had been arrested at the time Dawson was asked to identify

the gun, and that Santos was brought out of the apartment in handcuffs and shown to Dawson at the same time that she was shown the silver gun. *See* Tr. at 58.

**20.** Sergeant Santana did not see Officers Laschet, Brennan and Curtin enter the bedroom with Santos because he was engaged in conversation with Santos's mother. *See* Tr. at 86. Nor did he hear the conversation the officers had with Santos during that time, and therefore does not know whether they asked Santos for consent to go into the bedroom or whether Santos gave such consent. *See id.* at 86–87.

During the time that Sergeant Santana was talking with Officer Laschet, Officer Mercado continued talking with Santos's mother.[21] *See id.* at 78, 90, 93. Officer Mercado did not search any part of the living room/dining room at that time, or at any other time.[22] *See id.* at 90, 93.

Sergeant Santana believes that the officers showed the gun that was recovered in the bedroom to Dawson when they took Santos downstairs. *See id.* at 89. According to Sergeant Santana, Dawson was outside the building, and was not visible from the apartment. *See id.* at 90.

After the officers took Santos out of the apartment, Sergeant Santana walked back over to Santos's mother and Officer Mercado. *See id.* at 79, 90. Santos's mother asked Sergeant Santana and Officer Mercado what was going to happen to Santos, and they explained that he would be taken to the 43rd Precinct. Officer Curtin then called Sergeant Santana over to the door, and told him that the firearm that was recovered in the bedroom was not the firearm that Dawson had described earlier. *See id.* at 80, 91. Sergeant Santana called Officer Mercado over, relayed this information to him, and said, "there must be another firearm somewhere." *Id.* at 80. Officer Mercado turned around, walked over to the dining area, lifted up the corner of the area rug, and discovered the .32 caliber pistol.[23] *See id.* at 80–81, 94–95. He pulled the firearm out from under the

rug and walked out of the apartment. *See id.* at 95.

## IV. FACTUAL FINDINGS

### A. Santos Gave the Officers Permission to Enter the Apartment

■ Based on my review of the entire record, I find that Santos gave the officers permission to enter the apartment. Santos acknowledges that at the time the police knocked on the door, he was about to call the police, and the testimony of all of the witnesses confirms that before Santos realized the police were at the door, he stated, "I'm calling the police." *Id.* at 13–14, 43, 73, 83, 154. Thus, Santos presumably was relieved that the police were at the door, and it is logical that Santos therefore gave the officers permission to enter the apartment. Moreover, although Santos does not explicitly admit that he invited the officers into the apartment, nowhere in the record does Santos deny having granted the officers permission to enter. *See* Def. Mem. at 2.

### B. The Officers Were Not Given Permission to Enter or Search the Bedroom

I further find that neither Santos nor his mother gave the officers permission to search Santos's bedroom. Officer Brennan testified that he heard Officer Laschet ask Santos for permission to enter the bedroom, and heard Santos consent. *See*

---

21. Sergeant Santana could not hear Officer Mercado's conversation with Santos's mother after he walked away. *See* Tr. at 79.

22. Initially, Sergeant Santana testified that "the whole time" he was talking with Officer Laschet, Officer Mercado was "standing by" Santos's mother. Tr. at 90. On re-direct, Sergeant Santana testified that while he was talking with Officer Laschet, he was not aware of what Officer Mercado was doing. *See id.* at 97–98.

23. On cross-examination, Sergeant Santana testified that he did not observe Officer Mercado search the apartment at any time, that "[n]one of my officers searched that location," Tr. at 90, and that "there was never a search done," *id.* at 95. Sergeant Santana offered no testimony regarding whether he viewed Officer Mercado's actions in lifting the rug as a "search."

Tr. at 45, 58. Santos denies that the officers asked for permission to enter or search the bedroom, and denies that he granted such permission. *See id.* at 157; Santos Dec. ¶ 3. Neither Officer Mercado nor Sergeant Santana heard Officer Laschet request permission to enter or search the bedroom or heard Santos consent, *see* Tr. at 26, 30, and both Santos's mother and uncle deny that Santos consented to a search of his bedroom, *see* Tejeda Dec. ¶ 3; 4/9/03 Declaration of Manuel de Jesus Tejeda Guzman, Ex. C to Def. Pre–Hrg. Mem., ¶ 3. Although neither Santos's mother nor his uncle speak English, and therefore may not have heard such an exchange, both testified that Santos repeatedly instructed his mother, in Spanish, not to give the officers permission to search the apartment. *See* Tr. at 109, 131, 140, 160–61.

I find Santos's testimony, together with the testimony of his mother and uncle, to be more credible than Officer Brennan's testimony on this issue. The officer who purportedly asked for permission to enter and search the bedroom was Officer Laschet, and he did not testify. Nonetheless, the Government submits that Officer Laschet's testimony would corroborate Officer Brennan's testimony. Even assuming that the two officers testified that Santos gave them permission to enter and search his bedroom, I find such testimony patently incredible. Santos repeatedly instructed his family not to consent to any search of the apartment. He denied that he gave his consent, and his mother and uncle denied that Santos gave consent. Neither Sergeant Santana nor Officer Mercado heard Santos consent to a search of the bedroom. Under the circumstances described here, I credit Santos's testimony. I therefore conclude that the officers were not given permission to enter or search the bedroom.

## C. The Officers Were Not Given Permission to Search the Living Room

I also find that the officers were not given permission to search any other area of the apartment, including the living room/dining room. Officer Mercado testified that upon entering the apartment, he asked Santos's mother for permission to "take a quick look around," *id.* at 16, and that Santos's mother consented to a limited search of the living room, *see id.* at 17.

Officer Mercado's testimony is inconsistent with all of the other evidence offered at the hearing. Specifically, Sergeant Santana testified that upon entering the apartment, he and Officer Mercado immediately began speaking with Santos's mother in Spanish, explaining to her that they were responding to a report of an armed robbery inside the apartment. *See id.* at 76–77. Sergeant Santana testified that he never heard Officer Mercado request permission from Santos's mother to search the living room at that time or at any other time. Nor did any of the other testifying officers hear Officer Mercado request permission from Santos's mother to search the apartment, or hear Santos's mother consent to such a search. Santos's mother denies that she gave Officer Mercado or any other officer permission to search any area of the apartment, *see id.* at 109, 131, 157; Tejeda Dec. ¶ 3, and Santos, his mother and his uncle all testified that Santos repeatedly instructed his mother not to give the officers permission to search, *see* Tr. at 109, 131, 140, 157, 160–61.

Officer Mercado's testimony on this issue is simply not credible. If Officer Mercado had asked Santos's mother for permission to search the apartment, it is likely that Sergeant Santana would have heard the exchange. Although Sergeant

Santana testified that he was unable to hear the conversation between Officer Mercado and Santos's mother when Officer Laschet summoned him towards the bedroom after discovering the air pistol, see id. at 79, Officer Mercado testified that he asked Santos's mother for permission to search *upon entering the apartment*. See id. at 16–17.

Accordingly, I find that Officer Mercado did not seek permission to search, and Santos's mother did not consent to a search of the living room/dining room.

### D. The Pistol Recovered from Underneath the Rug Was Not in Plain View [24]

■ Finally, I find that the .32 caliber pistol was not in plain view. Santos testified that before opening the door for the police officers, he pulled a chair away from the table, lifted the table slightly, lifted the rug that was under the table, and put his .32 caliber pistol underneath the rug. *See id.* at 155. Santos's mother testified that Santos put the pistol approximately an arm's length underneath the rug. *See id.* at 108.

Officer Mercado testified that he first saw only a "hump" beneath the rug, and that he could not determine whether the "hump" was caused by an object or air. *See id.* at 18–19, 31. He further testified that after stepping on the "hump" and discerning that it was an object, he got down on one knee and, without lifting the rug at all, looked underneath the rug with a flashlight. *See id.* at 19–20, 31. According to Officer Mercado, from this vantage point he could see the gun, and only then did he lift the rug. *See id.*

Sergeant Santana's testimony contradicts Officer Mercado's testimony. Sergeant Santana testified that after Officer Mercado was informed that there was another, yet-undiscovered firearm in the apartment, Officer Mercado walked directly over to the dining area, lifted the rug, and discovered the .32 caliber pistol. *See id.* at 80–81, 94–95.

Once again, Officer Mercado's testimony on this issue is not credible. Clearly the pistol was fully underneath the rug and not visible to Officer Mercado, even with the aid of a flashlight, without lifting the rug.

## V. LEGAL STANDARD

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and Warrants shall issue, but upon probable cause ..." U.S. Const. amend. IV. The Supreme Court repeatedly has held that pursuant to the Fourth Amendment, "searches and seizures inside a home without a warrant are presumptively unreasonable." *United States v. Karo*, 468 U.S. 705, 714–15, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984); *see also Agnello v. United States*, 269 U.S. 20, 32, 46 S.Ct. 4, 70 L.Ed. 145 (1925) ("The search of a private dwelling without a warrant is *in itself* unreasonable and abhorrent to our laws." (emphasis added)); *Anobile v. Pelligrino*, 274 F.3d 45, 61 (2d Cir.2001) ("[H]omes receive the highest Fourth Amendment protections."). Thus, "the Fourth Amendment has drawn a firm line at the entrance to the house." *Steagald v. United States*, 451 U.S. 204, 212, 101

**24.** Although Officer Brennan testified that the bedroom night-stand drawer was open and the air-pistol therefore was visible when he walked into the bedroom, I make no finding with respect to whether the air-pistol was in plain view because there was no justification for the officers' presence in the bedroom at the time the air-pistol was discovered. *See supra* Part IV.B and *infra* Part VI.A.

S.Ct. 1642, 68 L.Ed.2d 38 (1981) (quotations and citation omitted).

## A. Exceptions to the Search Warrant Requirement

Although the Fourth Amendment "generally requires police to secure a warrant before conducting a search," *Maryland v. Dyson,* 527 U.S. 465, 466, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999), there are two exceptions to this strict prohibition against searching a person's home without a warrant: exigent circumstances and consent, *see Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *Coolidge v. New Hampshire,* 403 U.S. 443, 474–75, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ("a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show ... the presence of exigent circumstances").

### 1. Consent

"[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041. *See also United States v. Mendenhall,* 446 U.S. 544, 557, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). "[T]he ultimate question presented is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995) (citing *United States v. Sanchez,* 32 F.3d 1330, 1334–35 (8th Cir.1994)). "Recent Supreme Court decisions emphasize ... that the issue of reasonableness is to be measured by an objective standard." *Garcia,* 56 F.3d at 423. When determining "objective reasonableness," a court must ask: "what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 183–89, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). "Of course, this objective standard does not preclude an assessment of the particularities of the situation that [are] presented in any given case. On the contrary, it is still the totality of the circumstances that must be considered." *Garcia,* 56 F.3d at 423.

### 2. Exigent Circumstances

 Police officers also may conduct a warrantless search of a home where there are exigent circumstances. *See Payton,* 445 U.S. at 590, 100 S.Ct. 1371. Such circumstances exist when the police are in hot pursuit of a fleeing felon, or where there is a risk of imminent destruction of evidence, a need to prevent a suspect's escape, or a risk of danger to the police or other persons inside or outside the dwelling. *See Minnesota v. Olson,* 495 U.S. 91, 100, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990). In the absence of a hot pursuit, the police must have probable cause to believe that exigent circumstances exist. *See id.* Notably, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." *Welsh v. Wisconsin,* 466 U.S. 740, 749–50, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984).

## B. Permissible Warrantless Seizures of Property

 In addition to the delineated exceptions to the Fourth Amendment warrant requirement, there are two circumstances in which the police may seize contraband in a home without a warrant: (1) where the contraband is discovered in the course

of a protective sweep; and (2) where the contraband is in plain view. *See Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (protective sweeps); *Horton v. California*, 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990) (plain view).

### 1. Protective Sweeps

 "A protective sweep is a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those *places in which a person might be hiding.*" *Buie*, 494 U.S. at 327, 110 S.Ct. 1093 (emphases added). *See also United States v. Blue*, 78 F.3d 56, 61 (2d Cir.1996) ("Even where an arresting officer is justified in conducting a sweep for unseen third parties in a residence, the officer is not entitled to conduct a full search of the premises ... [S]uch a search may only encompass those spaces where an individual might be found."). An officer effecting an arrest in a residence may,

> without probable cause or reasonable suspicion, look in closets or other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. Beyond that, however, [ ] there must be articulable facts which, taken together, with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.

*Buie*, 494 U.S. at 334, 110 S.Ct. 1093.

In *United States v. Hernandez*, 941 F.2d 133, 137 (2d Cir.1991), the Second Circuit

clarified that a protective sweep can involve both a search for individuals and a search for "weapons within the grab area of an individual whom the government agents have reasonably concluded is dangerous." Moreover, a protective sweep of the area immediately around the suspect can be conducted after the suspect has been restrained if the sweep is a "reasonable and proper attempt to 'neutralize the threat of physical harm.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

### 2. Plain View [25]

 If the police are lawfully inside a home, they may seize contraband without a warrant if it is in plain view, its incriminating character is immediately apparent, and the officers have a lawful right of access to the object. *See Horton*, 496 U.S. at 136–37, 110 S.Ct. 2301; *Washington v. Chrisman*, 455 U.S. 1, 5–9, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982); *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999). Patently incriminating evidence that is in plain view during a proper protective sweep may be seized without a warrant. *See Kiyuyung*, 171 F.3d at 83. Moreover, the fact that artificial means, including a flashlight, are used does not prevent the item from being in plain view. *See Brown*, 460 U.S. at 739–40, 103 S.Ct. 1535; *United States v. Ocampo*, 650 F.2d 421, 427 (2d Cir.1981).

### C. Burden of Proof

Once a defendant establishes a basis for a suppression motion, the government must prove that the search was proper by

---

**25.** Although frequently described as an "exception" to the Fourth Amendment warrant requirement, the plain view doctrine is not an independent exception because the doctrine cannot be invoked without "prior justification under the Fourth Amendment" for access to the object seized. *Texas v. Brown*, 460 U.S. 730, 738, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). The plain view doctrine is thus better understood as an "extension of whatever the prior justification for an officer's access to an object may be." *Id.* at 739, 103 S.Ct. 1535.

a preponderance of the evidence. *See Mendenhall*, 446 U.S. at 557, 100 S.Ct. 1870; *United States v. Matlock*, 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir.1983).

## VI. DISCUSSION

### A. Seizure of the Weapons

Because I conclude that there was no consent to a search of any room in the apartment, *see supra* Parts IV.B–C, the officers' seizure of the two firearms can be justified only if (1) exigent circumstances authorized a search without a warrant; or (2) the weapons were discovered during a protective sweep.[26] I find that neither justification is present here.

### 1. No Exigent Circumstances Justified the Search of Santos's Apartment

■ The Government contends that exigent circumstances justified the war-

rantless search of the apartment. *See* Post–Hearing Opposition to Defendant's Motion to Suppress at 1–2. This argument finds no support in the record. None of the officers testified that they believed that there was a risk of imminent destruction of evidence or danger to the police or other persons.[27] Moreover, in its submissions to the Court, the Government fails to point to any evidence of exigent circumstances.[28] I therefore conclude that there were no exigent circumstances justifying the warrantless search of Santos's bedroom and living room/dining room.

### 2. The Protective Sweep Doctrine Does Not Justify the Warrantless Search of Santos's Apartment

■ The protective sweep doctrine does not permit officers who are lawfully inside a dwelling for some purpose other than an arrest to search for contraband, and then use that contraband as justification for a subsequent arrest. That is precisely what happened here. When the offi-

---

**26.** Although the police may seize contraband that is in plain view if the police are lawfully present, *see supra* Part V.B.2., that tenet has no application here because I have concluded that the .32 caliber pistol was not in plain view, *see supra* Part IV.D, and the police did not have a lawful right of access to the bedroom where the air-pistol was discovered, *see supra* Part IV.B, *infra* Part VI.A.1–2. *See also Brown*, 460 U.S. at 738, 103 S.Ct. 1535.

**27.** Obviously, the officers were not in hot pursuit of a fleeing felon and there was no need to prevent a suspect's escape.

**28.** The cases upon which the Government relies in support of its exigent circumstances argument are inapplicable. *See Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967) (exigent circumstances justified warrantless search of a home where the police were in hot pursuit of an armed robber who had entered the home); *Tierney v. Davidson*, 133 F.3d 189 (2d Cir.1998) (exigent circumstances justified warrantless search of

a home where the police reasonably believed that a violent domestic dispute had occurred in the home); *United States v. MacDonald*, 916 F.2d 766 (2d Cir.1990) (warrantless entry into apartment to effectuate an arrest justified by exigent circumstances where defendant was armed, the law enforcement agents had firsthand knowledge that ongoing crimes were transpiring, and the officers had a reasonable belief that the defendant would escape if not swiftly apprehended); *United States v. Fields*, 113 F.3d 313 (2d Cir.1997) (warrantless entry into residence to effectuate an arrest justified by exigent circumstances where police saw defendants engaged in the commission of a crime through a window, one defendant had a reputation for violence and had a loaded automatic weapon within his reach, and the police had a reasonable belief that the defendants would attempt to flee or destroy evidence after being alerted to police presence).

cers entered Santos's apartment, they did not have an arrest warrant, and there is no evidence in the record that they believed they had probable cause to arrest Santos. Sergeant Santana testified that Santos was arrested after the discovery of the air-pistol for "robbery and possession of a firearm." Tr. at 88. Officer Brennan testified that Santos was arrested for robbery because after the discovery of the air-pistol, there was "enough circumstantial evidence" that Santos had committed robbery. *Id.* at 58. The officers thus acknowledge that it was not until after they discovered the air-pistol in the bedroom that they believed they had sufficient grounds to arrest Santos. Under these circumstances, the Government cannot rely on the protective sweep doctrine to justify the warrantless searches that led to the recovery of the firearms because these searches were not done to ensure the officers' security during the course of an arrest.[29]

Moreover, even if a protective sweep had been authorized, the testimony of the officers makes clear that neither weapon was recovered in the course of such a sweep. Officer Brennan testified that when he entered the apartment he "looked around the perimeter [to] make sure no one [wa]s going to come out of any rooms or any doors." Tr. at 45. He did not discover either of the firearms during that perimeter check. Officer Mercado testified that when he entered the apartment, he "stepped [into the bedroom] to see if there was anybody there . . . There was nobody there." *Id.* at 15. Officer Mercado did not discover the air-pistol during that check of the bedroom.

Additionally, Officer Brennan testified that the air-pistol was discovered in the bedroom after he, Officer Laschet and Officer Curtin entered the bedroom with Santos's consent. *See id.* at 45–46. Thus, according to Officer Brennan, the air-pistol was not discovered in the course of a protective sweep. Similarly, the .32 caliber pistol was not recovered in the course of a protective sweep. *See supra* n. 29.

In sum, neither weapon was recovered in the course of a protective sweep. Moreover, because the protective sweep doctrine is limited in two ways—the sweep must be incident to a lawful arrest and confined to areas where a person could hide or that are within a suspect's "grab area"—it cannot justify the officers' warrantless search of Santos's apartment.[30]

---

**29.** Even if Santos's arrest had been lawful, the protective sweep doctrine would not justify the officers' post-arrest search and recovery of the .32 caliber pistol. Although a protective sweep may be undertaken after a suspect is arrested and restrained, *see Hernandez,* 941 F.2d at 137, such a sweep is limited to the "grab area" around a suspect, and must be an attempt to neutralize a perceived threat, *see id.* The search that uncovered the .32 caliber pistol occurred after Santos had been arrested, restrained and *removed from the apartment.* Moreover, Officer Mercado's search under the rug cannot be justified as a search of a "space where an individual might be found," *Blue,* 78 F.3d at 61, because Officer Mercado clearly did not believe that the "hump" was a person. Thus, there can be no legitimate argument that the search under the dining room rug following Santos's arrest was part of a protective sweep.

**30.** In so finding, I am cognizant that law enforcement officers must be able to "tak[e] steps to assure themselves that the persons with whom they are dealing [a]re not armed with or able to gain immediate control of a weapon that could unexpectedly and fatally be used against them." *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *see also Terry,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. However, an officer's interest in protecting himself must be balanced against the protections afforded by the Fourth Amendment, and cannot be used to circumvent the Fourth Amendment. Thus, the Supreme Court and the Second Circuit have emphasized that before a law enforce-

## B. Santos's Post–Arrest Statements

 Because both the air-pistol and the .32 caliber pistol were recovered in the course of unlawful searches, any arrest premised on their recovery was unlawful. *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Furthermore, any statements that Santos made following the unlawful recovery of the weapons and the unlawful arrest must be excluded as fruits of the poisonous tree. *See Brown v. Illinois,* 422 U.S. 590, 604–05, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun,* 371 U.S. at 484–85, 83 S.Ct. 407; *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

## VII. CONCLUSION

For the reasons set forth above, Santos's motion to suppress the guns and the statements he made following the discovery of the guns is granted. A conference is scheduled for September 18, 2003 at 3:45 p.m.

SO ORDERED.

ment officer may undertake a search intended to protect herself, she must "possess a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Long,* 463 U.S. at 1050, 103 S.Ct. 3469. *See also Terry,* 392 U.S. at 21, 88 S.Ct. 1868; *Blue,* 78 F.3d at 59; *Hernandez,* 941 F.2d at 136.

Here, the Government has failed to set forth sufficient evidence that the officers had a reasonable belief that Santos was dangerous and might gain immediate control of a weapon. To the contrary, Sergeant Santana's testimony indicates that after Santos opened the apartment door, the officers did not feel threatened. Specifically, Sergeant Santana testified that before he knocked on the apartment door, he drew his weapon and held it at his side. *See* Tr. at 75. After Santos opened the door and Sergeant Santana observed that Santos was holding a cordless phone and Santos's mother and uncle did not have anything in their hands, he and the officers holstered their weapons. *See id.* at 75–76.